Billie H. TILLER, Petitioner,

v.

Barbara McLURE, Respondent.

No. 02–0136.

Supreme Court of Texas.

May 8, 2003.

---

Ken Slavin, Cynthia S. Anderson, Kemp Smith, LLP, Roy E. Kohn, El Paso, for petitioner.

Michael C. Crowley, Edward W. Dunbar, Dunbar Armendariz Crowley & Hegeman LLP, El Paso, for respondent.

PER CURIAM.

Barbara McLure sued Billie Tiller for intentional infliction of emotional distress based on Tiller's conduct as a party to two commercial construction contracts. The issue is whether there is legally sufficient evidence to support the jury's verdict in favor of McLure. The trial court granted Tiller's motion for judgment notwithstanding the verdict and rendered judgment that McLure take nothing. Finding some evidence to support the verdict, the court of appeals reversed the judgment notwithstanding the verdict, reduced the award of punitive damages in accordance with the statutory cap, and remanded to the trial court for rendition of judgment. 63 S.W.3d 72. We conclude that no evidence supports the jury's finding that Tiller's

conduct was extreme and outrageous, and therefore McLure's claim fails as a matter of law. Accordingly, we reverse the court of appeals' judgment and render judgment that McLure take nothing.

In reviewing the record, we view the evidence in the light most favorable to Barbara McLure. *See Brewerton v. Dalrymple,* 997 S.W.2d 212, 214 (Tex.1999). Billie Tiller decided to establish a self-storage business on property that he owned in El Paso. In August 1997, he executed two contracts with McLure Precast Corporation, a small construction company owned by Bill McLure and his wife Barbara McLure. The first contract called for construction of concrete shells, which were to be brought to the property, set up in rows, and used as bases for construction of 135 mini-warehouses. This contract was for $156,528. The second contract designated McLure Precast as the construction project manager, established a guaranteed maximum cost for the entire project of $425,570, and stated that the estimated management fee was $12,195. Subcontractors were to perform a large portion of the construction, including earth work, paving, overhead door installation, and painting. The sequencing of the work at the construction site was to be managed by McLure Precast. However, the various subcontractors were to contract directly with Tiller. In October 1997, Tiller borrowed $300,000 to finance the project.

In December 1997, shortly after work began at the construction site, Bill McLure was diagnosed with a malignant brain tumor. McLure was a civil engineer whose corporate duties included design work, engineering, and supervising construction. Due to McLure's illness, McLure Precast hired Doug Hansen in mid-December to serve as the on-site manager for Tiller's project. Hansen was an experienced construction supervisor. In addition, Barbara

McLure assumed many of the duties that had traditionally been performed by Bill McLure. Before her husband's illness, Barbara McLure had generally performed only payroll, accounts payable, and other administrative activities for the corporation. The business documents related to Barbara McLure's duties were kept in a corporate office attached to the McLures' residence. Despite his worsening health, Bill McLure continued to work in a limited capacity on Tiller's project until early February. For several days in early February, McLure Precast failed to give the project the attention it deserved. However, by mid-February, Barbara McLure had assumed full responsibility for managing the project and was committed to finishing it in a timely and workmanlike manner.

On February 16, 1998, Tiller received a three-page letter from McLure Precast regarding the mini-warehouse project. The letter was signed by Barbara McLure in her capacity as president of the corporation. The letter began by advising Tiller that Bill McLure's medical condition had become very serious and he therefore would be unable to assist in the completion of the project. The remainder of the letter set forth a detailed plan to finish the project. In the letter, Barbara McLure stated that Jack McLure, Bill's son, had "agreed to provide his services as a construction consultant to me" and she invited Tiller to contact Jack McLure with any questions, comments, or concerns regarding the project. Jack McLure was part-owner of Metalman, Inc., a large construction company located in Dallas. In the letter's final paragraphs, Barbara McLure stated:

> I look forward to working with you on the completion of this project. Please understand that with Bill in his present condition, this is a most difficult time for me. Nevertheless, rest assured that McLure Precast Corporation will com-

plete your project and maintain the fine reputation on which the firm was founded and built.

If you have any questions, comments or concern[s], please do not hesitate to contact me. If you cannot reach me at our office, [xxx-xxxx], or home [xxx-xxxx], you may reach me on my mobile phone at [xxx-xxxx].

Jack McLure testified that Tiller called Barbara McLure after receiving the February 16 letter and "raised hell with her" about the mini-warehouse project. On February 24, 1998, Jack McLure sent a second letter to Tiller. The letter, printed on Metalman, Inc. letterhead, stated in part:

We ask that you review your contract with McLure Precast Corporation. That agreement sets forth notice requirements and all other terms and conditions that govern the project. Phone calls to Barbara McLure and her children on Sunday morning voicing complaints is not per the contract and in view of my Dad's condition, I find it to be disgusting.

Also, please review the time of completion requirements as stated in the agreement. We find it very difficult to understand your complaints concerning time and performance when the project is on schedule. . . .

. . . .

If you have any questions, comments or concerns, please feel free to contact me. Call collect if you like. If you have *legitimate* complaints, please make them in writing and in accordance with the contract. I am thanking you in advance for refraining from any more nasty phone calls or outbursts with members of my family at a most difficult time.

(Emphasis in original.)

Bill McLure died on Thursday, February 26, 1998, and his funeral was scheduled for the next Monday. To honor Bill McLure's memory, Barbara McLure planned to shut down the mini-warehouse construction site for the entire day of the funeral. Tiller objected when Jack McLure advised him of Barbara McLure's plan, claiming incorrectly that the project was behind schedule. Although Tiller acknowledged that it would be appropriate for some of the construction workers to attend the funeral, he told Jack McLure that he would terminate the contracts if all construction activity ceased on the date of the funeral. Jack McLure informed Barbara McLure about Tiller's comments. Despite Tiller's threat to terminate the contracts, McLure Precast closed the construction site for the entire day of the funeral.

From the time he learned of Bill McLure's illness in December 1997 until construction ceased in March 1998, Tiller repeatedly telephoned Barbara McLure at her house regarding the mini-warehouse project. Barbara McLure testified that Tiller called her at home approximately sixty times during that period. Many of the calls occurred during non-business hours, including late in the evening, over the Christmas holidays, and once on a Sunday morning. In the numerous telephone calls, Tiller expressed dissatisfaction with the project's progress. Specifically, he complained that on-site workers were unproductive and that the project was behind schedule. He repeatedly threatened to terminate the contracts and take over the project. Tiller's tone during the telephone calls was consistently rude, demanding, and curt. Despite repeated requests to do so, Tiller never asserted any of his complaints in writing. The telephone calls required Barbara McLure to make approximately twenty-five unnecessary trips to the construction site.

Tiller was regularly slow to pay McLure Precast's invoices, including one that re-

quested payment of $30,000 for charges that Tiller had improperly made on McLure Precast business trade accounts. McLure Precast finished construction on the mini-warehouse project in March 1998. Once the project was completed, Tiller stopped calling Barbara McLure and initially refused to meet with her to discuss final payment. In April 1998, Tiller obtained an additional $100,000 in financing for the project. Although he had sufficient funds available, Tiller refused to make the final payment of $36,958. In June 1998, when he finally agreed to meet with Barbara McLure, Tiller told her: "Honey, there is not going to be any more money." As a direct result of Tiller's failure to pay the remaining balance due on the contracts, Barbara McLure was forced to liquidate the corporation. Tiller's course of conduct left Barbara McLure nervous, upset, crying, and shaking, and also caused her stomach problems, insomnia, and weight loss.

Two separate lawsuits were subsequently filed against Tiller. McLure Precast Corporation sued Tiller for breach of contract, and Barbara McLure, in her individual capacity, filed this case against Tiller for intentional infliction of emotional distress. The breach of contract action is currently pending in state district court. In this case, Barbara McLure obtained a jury verdict in her favor for $500,000 in actual damages and $1.5 million in punitive damages. The trial court granted Tiller's motion for judgment notwithstanding the verdict. The court of appeals reversed. It concluded that there was some evidence of extreme and outrageous conduct because, despite his knowledge that Barbara McLure was susceptible to emotional distress, Tiller "engage[d] in a course of conduct that a jury could have reasonably believed to be harassing, intimidating, bullying, and extreme." 63 S.W.3d at 82. Tiller petitioned this Court for review, arguing that no evidence supports the jury's finding that his conduct was extreme and outrageous.

A trial court may grant a judgment notwithstanding the verdict if there is no evidence to support one or more of the jury findings on issues necessary to liability. *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex. 1998). To determine whether there is no evidence to support the jury verdict and thus uphold the judgment notwithstanding the verdict, we view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001).

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson,* 985 S.W.2d 62, 65 (Tex. 1998). Extreme and outrageous conduct is conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 616 (Tex.1999). But when reasonable minds may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability. *Id.*

Tiller's most egregious action was his threat to terminate the contracts if the

construction site was closed for the entire day of Bill McLure's funeral. However, Tiller did acknowledge that it would be appropriate for some of the construction workers to attend the funeral. In addition, a few weeks before, a legitimate basis had existed for Tiller's concerns regarding the timely completion of the mini-warehouse project. Jack McLure testified that "McLure Precast hadn't given [Tiller's] project the attention it was due" for a couple of weeks in early February and that "I would have been very concerned if I was him at that point in time." Under the circumstances, Tiller's comments regarding the closing of the construction site on the date of Bill McLure's funeral, although callous and uncaring, do not rise to the level of extreme and outrageous conduct.

Tiller's telephone calls, although persistent and often insensitive given Bill McLure's illness and eventual death, were never excessive on any one day, nor did Tiller consistently call Barbara McLure at inappropriate times. *Cf. Household Credit Servs., Inc. v. Driscol,* 989 S.W.2d 72, 78–79 (Tex.App.-El Paso 1998, pet. denied) (noting that plaintiff was subjected to four to five calls a day, incessant calls to her workplace, and a pattern of calls at "odd-hour" times). According to Doug Hansen, Barbara McLure often fielded Hansen's calls regarding the mini-warehouse project in the evening. Although he repeatedly threatened to terminate the contracts, Tiller never physically threatened Barbara McLure or otherwise made threats unrelated to the contract. In addition, there is no evidence that he ever subjected Barbara McLure to severe verbal abuse by using vulgar or obscene language. While many of Tiller's phone calls were unquestionably insensitive given the situation and his tone was always rude and curt, rude or insensitive behavior generally does not rise to the level of extreme and outrageous conduct. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994).

Moreover, to determine whether certain conduct is extreme and outrageous, we consider the context and the relationship between the parties. *See GTE Southwest,* 998 S.W.2d at 612. This case involves two commercial construction contracts. As a corporate officer of McLure Precast, Barbara McLure was designated as a contact person for concerns and complaints relating to the $425,570 project. All of Tiller's calls, while numerous and unpleasant, related to the contracts. Although Tiller criticized the project, he never directly attacked Barbara McLure. Tiller's calls focused on criticism of the project and demands related to timeliness and workmanship. While Tiller's complaints and threats were self-centered and often unprofessional, they were related to an ordinary, albeit contentious, commercial contract dispute and do not rise to the level of extreme and outrageous conduct. And even if Tiller breached the contracts by refusing to make the final payment or breached other terms of the contracts, the mere fact that conduct violates a legal duty does not, standing alone, render it extreme and outrageous. *See, e.g., Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) ("[T]he mere fact of termination of employment, even if the termination is wrongful, is not legally sufficient evidence that the employer's conduct was extreme and outrageous...").

Barbara McLure does not explicitly contend that a specific single act committed by Tiller was extreme and outrageous. Rather, she argues that Tiller's entire course of conduct, viewed as a whole, was extreme and outrageous. The court of appeals recognized that "[a]lthough a single act, taken alone, may or may not rise to the level of 'extreme and outrageous' conduct, ... it is possible that several acts taken together can amount to such harassment as to be more than petty oppression." 63 S.W.3d at 82 (citing *Household*

*Credit,* 989 S.W.2d at 82). This Court has previously held that a course of conduct should be evaluated as a whole to determine whether it was extreme and outrageous. *See GTE Southwest,* 998 S.W.2d at 616 ("[W]hen repeated or ongoing severe harassment is shown, the conduct should be evaluated as a whole in determining whether it is extreme and outrageous.").

In *GTE Southwest v. Bruce,* three GTE employees were harassed for years by their supervisor's regular abuse, humiliation, and intimidation, which included persistent verbal and physical threats. *Id.* at 613–14. We concluded that, although occasional malicious and abusive incidents must often be tolerated in our society, "once conduct such as that shown here becomes a regular pattern of behavior and continues despite the victim's objection and attempt to remedy the situation, it can no longer be tolerated." *Id.* at 617. But it was not merely the regularity of the supervisor's conduct that led us to conclude that the conduct was extreme and outrageous as a matter of law; it was also its severity. *Id.* ("It is the *severity and regularity* of Shields's abusive and threatening conduct that brings his behavior into the realm of extreme and outrageous conduct.") (emphasis added). As we stated, "[b]eing purposefully humiliated and intimidated, and being repeatedly put in fear of one's physical well-being at the hands of a supervisor is more than a mere triviality or annoyance." *Id.* Similarly, in *Household Credit Services v. Driscol,* upon which the court of appeals in this case relied, the plaintiff recovered based on a daily pattern of obscenity-laden phone calls that on at least two occasions included bomb or death threats. *Household Credit,* 989 S.W.2d at 79. Thus, the mere fact that Tiller engaged in an inappropriate course of conduct does not necessarily mean that his conduct was extreme and outrageous. Rather, for Tiller to be liable, the conduct itself, when viewed as a whole, must be "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965). As previously discussed, Tiller's actions from December 1997 through June 1998 were regularly insensitive, unreasonable, or otherwise wrongful. However, even when viewed in its totality, Tiller's course of conduct in this commercial contract dispute was not severe enough to constitute extreme and outrageous conduct.

Because we conclude as a matter of law that Tiller's course of conduct was not extreme and outrageous, Tiller is entitled to judgment as a matter of law. Accordingly, pursuant to Rule 59.1 of the Texas Rules of Appellate Procedure and without hearing oral argument, we reverse the court of appeals' judgment and render judgment that Barbara McLure take nothing.