

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-273-CV

ROBERT FRENCH, INDIVIDUALLY          APPELLANT
AND ON BEHALF OF THE ESTATE          AND APPELLEE
OF VELMA RAE FRENCH, DECEASED

V.

LAW OFFICES OF WINDLE          APPELLEE
TURLEY, P.C.          AND APPELLANT

------------

### FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

This appeal arises out of the now ten-year pursuit of attorney's fees by the Law Offices of Windle Turley, P.C. ("LOWT") against Robert French. A jury awarded no damages on the quantum meruit claim filed by LOWT against French and $1,400,000 in damages on French's claim against LOWT for

---

[1] *See* Tex. R. App. P. 47.4.

intentional infliction of emotional distress ("IIED").  After the trial court set aside the jury's award on French's claim, both parties appealed.  Because we hold that the evidence was legally insufficient to support the jury's finding of no damages for LOWT, we reverse and remand in part.  Because we hold that the trial court did not err by setting aside the jury's award on French's IIED claim, we affirm in part.

## I. Facts and Procedural History

In 1995, Robert French decided to pursue a medical malpractice claim individually and on behalf of his wife's estate and, to that end, on December 12, 1995, he entered into a contingent fee agreement with LOWT.  LOWT assigned firm attorney David Surratt to work on the case.  Surratt left the firm in late August 1997.  Before he left, on August 11, 1997, Surratt drafted a brief internal file memorandum; the tone of the memo was one of a less-than-positive view of the likelihood of success in the case.  Surratt stated that he had met with LOWT attorney Mike Sawicki to discuss French's case and that he briefed Sawicki on the insurer's response to the firm's settlement package and French's strong desire to proceed with the suit.  He noted that a "suit might result in some form of settlement, but we may have a lot of obstacles."

Two days later (and a year and eight months after LOWT took French's case), on August 13, 1997, Surratt sent a letter to French stating that "[b]ased

2

on our analysis and considering the insurer's recent denial of a possible pre-suit settlement, we have determined that our firm would not be in a position to represent you in pursuit of a lawsuit." Surratt recommended that French consult another attorney about his options before deciding what to do about his case. Surratt stated that the firm had closed French's file and that Surratt would "prepare a packet of materials which would be helpful to an attorney's evaluation of your case." The letter informed French that his cause of action had a two-year statute of limitations.

French asked LOWT to reconsider, and consequently, LOWT agreed to have Sawicki review the case. Sawicki filed suit on behalf of French on September 5, 1997. Sawicki worked on the case for LOWT until February 2000, at which point he also left the firm.

After Sawicki left, French became unhappy with his legal representation, and he eventually terminated his relationship with LOWT and hired Sawicki. LOWT then filed a petition in intervention in French's lawsuit, seeking the full fee under the contingent fee agreement.

Sawicki, on French's behalf, filed a motion to strike the intervention and subsequently asked LOWT to submit the dispute to the Texas Bar Association

3

Fee Dispute Committee.[2]  Sawicki noted in a letter to LOWT that the disciplinary rules of conduct for attorneys encourage attorneys to settle fee disputes with clients through alternative dispute resolution.[3]  Sawicki, on behalf of French, also offered to reimburse LOWT for its expenses incurred while working on the case and to share attorney's fees.[4]  When LOWT declined to work out any kind of fee-sharing arrangement, French then asked LOWT to take the case back, but it refused.  When Sawicki filed a motion to withdraw as counsel and substitute LOWT, LOWT filed a response refusing to be substituted as counsel.  It asserted that an attorney-client relationship between the parties would not be possible given their history.  The trial court subsequently granted French's motion to strike LOWT's intervention.[5]

---

[2] *Law Offices of Windle Turley, P.C. v. French*, 140 S.W.3d 407, 409 (Tex. App.—Fort Worth 2004, no pet.).

[3] *See* Tex. Disciplinary R. Prof'l Conduct 1.04 cmt. 19, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon Supp. 2009) (Tex. State Bar R. art X, § 9) ("If a procedure has been established for resolution of fee disputes, such as an arbitration or mediation procedure established by a bar association, the lawyer should conscientiously consider submitting to it."); *see also* Fee Arbitration Rules, Tarrant County Bar Association Fee Arbitration Comm. (setting out rules for voluntary arbitration of fee disputes between attorneys practicing before courts in Tarrant County and their clients), *available at* http://www.tarrantbar.org/Default.aspx?tabid=50.

[4] *Windle Turley*, 140 S.W.3d at 409.

[5] *Id.* at 410.

4

French proceeded to trial in Tarrant County with Sawicki as counsel. After French obtained a favorable jury verdict, LOWT refiled its petition in intervention, asserting claims for breach of contract and quantum meruit.[6]

LOWT also filed a lawsuit in Dallas County, seeking attorney's fees and "injunctive relief prohibiting the District Clerk of Tarrant County from releasing any funds paid into the Registry of the Court that represented disputed attorney's fees and expenses."[7] The trial court there dismissed the suit on French's motion, finding that LOWT's pleadings were frivolous and groundless and were brought for the purposes of harassment, needlessly prolonging litigation and creating unnecessary expense. The court awarded French sanctions in the amount of $4,876.25. That ruling was upheld on appeal by the Dallas Court of Appeals.[8]

In the Tarrant County lawsuit, both parties moved for summary judgment on LOWT's second petition in intervention.[9] French argued that LOWT had abandoned its contingent fee agreement with him, LOWT's attempt to recover

---

[6] *Id.*

[7] *Law Offices of Windle Turley, P.C. v. French*, 164 S.W.3d 487, 489 (Tex. App.—Dallas 2005, no pet.).

[8] *Id.* at 494.

[9] *Windle Turley*, 140 S.W.3d at 410.

5

the fee was unconscionable, the contingent fee agreement violated public policy, and he had good cause to terminate the contract with LOWT.[10] The trial court granted French's motion and denied LOWT's.[11] On appeal, this court reversed and remanded the contingency fee dispute to the trial court.[12]

After remand, a jury trial was held on LOWT's quantum meruit claim (LOWT had dropped its breach of contract claim against French on the day of trial) and an IIED claim filed by French. The trial court denied LOWT's motion to disqualify Sawicki from representing French, in which it had asserted that Sawicki should be disqualified because he was a necessary witness as to essential facts on LOWT's quantum meruit claim. After hearing testimony, the jury entered a verdict finding LOWT's damages to be $0. The jury also found for French on his IIED claim, awarding him $1,400,000. The trial court, on LOWT's motion, set aside that finding and rendered a judgment notwithstanding the verdict ("JNOV") against French on his IIED claim.

---

[10] Neither Gwenda Dunn, another plaintiff in the underlying action, nor her motion for summary judgment, is before us.

[11] *Windle Turley*, 140 S.W.3d at 410.

[12] *Id.* at 415.

## II. LOWT's Cross-Appeal

**LOWT's Quantum Meruit Claim**

We address LOWT's cross-appeal first. LOWT brings two issues on appeal. In its first issue, it argues that the evidence was legally and factually insufficient to support the jury's finding of $0 on its quantum meruit claim.

**Standard of Review**

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[13] A party complaining that the evidence is factually insufficient on a finding on which the party had the burden of proof must show that the jury's finding was "against the great weight and preponderance of the evidence."[14]

---

[13] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[14] *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

7

**Applicable Law**

Quantum meruit is an equitable remedy, independent of a contract,[15] "based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted."[16] Recovery under this remedy is available to a party when the nonpayment for the services rendered would "'result in an unjust enrichment to the party benefitted by the work.'"[17] To recover under quantum meruit, the party must show that valuable services were rendered for the defendant and that the services were accepted, used, and enjoyed by the defendant, under such circumstances as reasonably notified the defendant that the plaintiff in performing such services was expecting to be paid by the defendant.[18]

When an attorney working on a contingent-fee basis is discharged without cause before the representation is completed, the attorney may seek

---

[15] *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198–99 (Tex. App.—Fort Worth 2006, no pet.).

[16] *Campbell v. Nw. Nat'l Life Ins. Co.*, 573 S.W.2d 496, 498 (Tex. 1978); *Residential Dynamics*, 186 S.W.3d at 199.

[17] *Residential Dynamics*, 186 S.W.3d at 198 (quoting *City of Ingleside v. Stewart*, 554 S.W.2d 939, 943 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.)).

[18] *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990).

compensation in quantum meruit, subject to the prohibition against charging or collecting an unconscionable fee.[19] If an attorney abandons his client without just cause, the attorney forfeits his right to compensation.[20] In such a case, the law does not provide that services rendered have no value; rather, when payment is excused because of the attorney's abandonment, the attorney may not recover for the services, regardless of their value.[21]

In determining whether a fee is reasonable, the factfinder should consider the following factors, as applicable:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;

---

[19] *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561–62 (Tex. 2006).

[20] *Royden v. Ardoin*, 160 Tex. 338, 331 S.W.2d 206, 209 (1960).

[21] *See id.* (stating that an attorney is not entitled to compensation when he abandons his client without just cause before the proceeding for which he was retained has been conducted to its termination).

9

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.[22]

**Testimony at Trial**

LOWT called Sawicki as its first witness. Sawicki testified that he did not know how much the services he provided at LOWT were worth. When asked if he had taken any depositions while at the firm, he stated that he thought he had but could not remember. He disagreed with an assessment that the case was 80% ready for trial when he left the firm. When asked if he thought it was 50% ready, he stated that "[t]he short answer would be, no," and "I don't know how to quantify percentages, so I can't say that." He asserted his belief that LOWT was not entitled to recover for work done by Surratt and that there should be no compensation for it because Surratt had done nothing to create value for the case, but he agreed that LOWT was entitled to recover the value of services that he himself had rendered while at LOWT. He assumed that he

---

[22] *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); *Burnside Air Conditioning & Heating, Inc. v. T.S. Young Corp.*, 113 S.W.3d 889, 897–98 (Tex. App.—Dallas 2003, no pet.) (noting that the record need not contain evidence on each of the factors).

had filed a request for admissions from the defendant, but he could not remember specifically having done so, and he could not say how long it would have taken him to do so because he sometimes used forms for drafting such documents. He further stated that it may have been something that a legal assistant at the firm had done. He agreed that if he had used a form, he probably would have read over it and made sure it was tailored to French's case. He did not specifically remember sending a request for admissions to one of the defendants in the medical malpractice case, although he assumed that he had done so. When asked if LOWT should be compensated for his filing a request for admissions, Sawicki stated, "I guess so."

He agreed that he had sent some interrogatories to the defendants, but he did not remember if he wrote them himself or used a form. He did not specifically remember sending any, but he stated that it was likely that he did so. He also stated that it was likely he had sent some requests for production, although he did not remember. When asked if such work provided "good and valuable services," he testified "I guess so," but he was not sure what was meant by "good and valuable."

All in all, Sawicki's testimony was that he did not remember drafting documents such as requests for admission or interrogatories, but in all likelihood he did do so because that is what he normally would have done. He could not

11

remember how long such tasks would have taken because he could have used a form, and if he used a form, it would not have taken much time.

Sawicki filed the original petition in French's lawsuit, and it was nine pages long. He agreed that if the defendant's attorney had sent something to LOWT, he would have read it. When asked if this service would have been valuable to French, he stated, "I guess so" and then "yes." He was asked what percentage of work on the case had been done prior to April 20, 2000, when French informed LOWT that he no longer wanted the firm to represent him, and he stated that he could not give a percentage.

In terms of value, Sawicki stated that his evaluation of the value of the case as of the day that French brought him the case would have been based on the settlement offer on the table at that time, which was in the range of $125,000 to $150,000. Thus, he testified, 40% of that figure was what LOWT "could have picked up off the table" on that date. He did not state that figure as what he thought his services at LOWT were worth but rather as what LOWT could have recovered in attorney's fees from French as of that date.

On cross-examination, Sawicki testified that on August 13, 1997, Surratt had sent a letter to French stating that the firm could not proceed further with the claim, and as of that date, LOWT had not filed suit on French's behalf. By this time, it was close to the two-year statute of limitations on French's claim.

12

After Sawicki left the firm, John Kirtley was assigned to the case. Kirtley told French that he had never tried a medical malpractice case and was looking forward to learning about them. Sawicki also testified that Turley's assistant at LOWT told French that he should get another lawyer. Sawicki tried to work out a joint venture arrangement with LOWT, but Turley refused. Sawicki tried to send the files back to LOWT, but the firm refused delivery of the files and declined to represent French any further.

LOWT next called Steve Maxwell as an expert witness. Maxwell testified that he was board certified in personal injury law. LOWT provided him with 4,000 or 5,000 pages of documents, which were copies of work done on the French case from the time French hired LOWT through April 24, 2000. Maxwell did not look at all the documents that were sent to him, but he did go through the boxes and formed a general idea of what the documents comprised.

Maxwell testified that from his review, most of the work had been done by Sawicki and that Sawicki had done an excellent job. In his opinion, there was value to a client in the process an attorney goes through in evaluating whether to go forward with a case. He testified that it looked like Surratt had been investigating the case prior to Sawicki taking over. Maxwell testified that Surratt had done everything he was supposed to do. Maxwell also stated that

13

prior to April 2000, when French notified LOWT that he no longer wished the firm to represent him and that he was hiring Sawicki, depositions were taken, interrogatories and requests for disclosure were sent out, and motions to compel were filed.

LOWT's attorney asked Maxwell his opinion as to the minimum amount of hours he thought would have been necessary to perform the work that he had reviewed. Maxwell stated that, based on his experience, anywhere from 400 to 700 hours "would not be at all unusual" as an accurate recounting of the time that was spent on the work. No evidence of billing records was introduced, and there was no testimony from anyone at LOWT about the amount of time actually spent on the case. Maxwell testified that when time records are not kept, it is impossible to be precise as to how much time is spent on a case, but that he could go through the documents produced and "get a pretty good idea of all of the work that was being done" and that "it's obvious that hundreds of hours were spent." Maxwell further stated that his guess was that for a medical malpractice case worked on a contingency basis in 1996 through 2000, a $350 to $400 an hour billing rate would be "in the middle of what would be a reasonable fee on that kind of basis."

On cross-examination, Maxwell acknowledged that he did not review what went on in the trial. When asked if he would agree then that he did not

14

know what actually won or lost the case, he stated, "I have my beliefs, because I can look at what was done to get this case ready, and I can kind of see where the strengths and the weaknesses [lie]," but he acknowledged that he did not know what document, deposition, testimony, arguments, or facts won the underlying case.

**Analysis**

In a pretrial conference held the day of the trial, Sawicki expressed concern to the trial court about whether he would be allowed to present evidence on whether the attorney-client relationship had been terminated for good cause. The trial court responded that it believed that because LOWT had dropped its breach of contract claim, it had negated the issue of good cause. The trial court did indicate that it would allow some testimony about events prior to the date of termination. In his proposed jury charge, French submitted a question asking whether he had good cause to terminate his contract with LOWT. In the charge submitted to the jury, though, the jury was not asked whether French had terminated the contract with LOWT for good cause or if LOWT had abandoned French without just cause.[23] French also submitted a

---

[23] *See Royden*, 331 S.W.2d at 209 (stating that an attorney is not entitled to compensation when he abandons his client without just cause before the proceeding for which he was retained has been conducted to its termination).

question asking whether French's compliance with the contract was waived, but the trial court denied French's request to include that question.

Page three of the charge included a section headed "INSTRUCTIONS," under which only the following appeared:

Failure to comply by [French] is excused if all the following circumstances occurred:

1. [LOWT]

   a. by words or conduct made a false representation or concealed a material fact,

   b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

   c. with the intention that [French] would rely on the false representation or concealment in acting or deciding not to act, and

2. [French]

   a. did not know and had no means of knowing the real facts, and

   b. relied to his detriment on the false representation or concealment of the material facts.

The jury was not, however, asked to make a finding about whether French was excused. French does not argue on appeal that the trial court erred by omitting a question on excuse.

16

Question one appears on the next page of the charge. That question asked,

What is the reasonable value of work performed by [LOWT] on Robert French's behalf from December 12, 1995 to April 20, 2000?

Factors to consider in determining the reasonable value, if any, are—

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer in dollars and cents, if any.

17

The charge did not include any instruction on quantum meruit, and the jury was not asked to make any findings on the separate elements of quantum meruit. In other words, the charge's question assumed that LOWT proved its entitlement to recover on its quantum meruit claim. Although French objected in the trial court that there was no evidence to support the claim's elements, and thus no question on quantum meruit should be submitted to the jury, he did not object to the failure to include questions on the specific elements of the actual claim. We therefore measure the sufficiency of the evidence against the charge that was actually submitted, rather than the charge that should have been submitted.[24]

Because of the way that the charge was written, we cannot determine the basis for the jury's decision. That is, we cannot determine, for example, whether the jury's answer contains an implied finding that payment is excused or whether it was a finding that no valuable services were rendered after considering the *Arthur Anderson* factors. Whatever the jury's reasoning, we are guided by the holding of the Supreme Court of Texas in *Midland Western*

---

[24] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.) (holding that when no objection is made to the charge, the sufficiency of the evidence is measured against the charge submitted), *cert. denied*, 530 U.S. 1244 (2000); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002) (holding that when the opposing party objects to the charge, sufficiency of the evidence is measured against the charge that should have been submitted).

18

*Building*.[25]  In that case, the jury had awarded damages for the plaintiff but did

not award attorney's fees.  The court said:

> The jury's award of no fees, however, was improper.  First Service
> offered evidence of its attorney's fees and the value thereof.  While
> the jury could have rationally concluded that a reasonable and
> necessary fee was less than the amount sought, an award of no
> fees was improper in the absence of evidence affirmatively showing
> that no attorney's services were needed or that any services
> provided were of no value.[26]

And this court has held that the evidence is insufficient to support a jury's

finding of no value of work in a quantum meruit claim when the evidence is

uncontroverted that a person's work had value, even if there is no conclusive

evidence of a specific value of the work.[27]

Similarly, in this case, French did not make an affirmative showing that

no attorney's services were needed or that the services provided were of *no*

value.  French's and Sawicki's testimony contradicted LOWT's evidence as to

value but did not establish a lack of any value.  Although Sawicki could not give

an accurate estimate of the time that he spent on the case while at LOWT, and

he did not establish a definite value for the services, he did not affirmatively

---

[25] *Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam).

[26] *Id.*

[27] *Kitchen v. Frusher*, 181 S.W.3d 467, 476 (Tex. App.—Fort Worth 2005, no pet.).

show that the services were of no value whatsoever. And even Sawicki acknowledged, albeit reluctantly, that at least some of the services that he assumed he had provided had some value to French. So even if the jury disbelieved Maxwell's testimony in estimating the value of the services provided, which would have left the jury with no testimony as to what the value actually was, there was no showing at the trial that the proper measure of the value was zero. Thus, although the jury could have perhaps properly found that the services were worth less than Maxwell asserted, it could not find $0. Accordingly, because there was no evidence to support the jury's finding and LOWT established that its services were of some value, we sustain Appellant's first issue. Because under the evidence, LOWT established that its services were of some value but did not establish a specific value of the services as a matter of law, under *Midland*, we remand this question to the trial court.[28]

---

[28] *See Midland*, 300 S.W.3d at 739–40 (reversing and remanding on legal sufficiency grounds when there was no evidence to support the jury's verdict of zero attorney's fees but no specific amount of attorney's fees was established as a matter of law); *see also McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 210—11 (Tex. App.—Austin 2005, pet. denied) (reversing the jury's award of zero attorney's fees because no evidence supported it and remanding the issue to the trial court because the record did not conclusively prove any particular amount as reasonable and necessary).

**Sawicki's Representation of French**

In its second issue, LOWT argues that the trial court abused its discretion by refusing to disqualify Sawicki and allowing him to act as French's attorney and testify as a witness. It contends that Sawicki was an essential witness in the litigation and that the trial court's permitting him to testify was prejudicial to LOWT.

**Standard of Review**

We review a trial court's denial of a motion to disqualify counsel under an abuse of discretion standard.[29] A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to any guiding principles.[30] A trial court also abuses its discretion if it fails to analyze or apply the law correctly.[31]

**Analysis**

Rule 3.08 of the Texas Rules of Disciplinary Procedure provides that an attorney shall not act as an advocate in an adjudicatory proceeding if the

---

[29] *See In re Sanders,* 153 S.W.3d 54, 56 (Tex. 2004).

[30] *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

[31] *Sanders,* 153 S.W.3d at 56.

21

attorney knows or believes that he "may be a witness necessary to establish an essential fact" on his client's behalf *unless*

> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;
>
> (3) the testimony relates to the nature and value of legal services rendered in the case;
>
> (4) the lawyer is a party to the action and is appearing pro se; or
>
> (5) the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.[32]

Comment nine to this rule states that the rule is a disciplinary standard "and is not well suited to use as a standard for procedural disqualification."[33] Although the rule does not provide a standard for disqualification proceedings, comment ten states that the rule may provide *guidance* in a disqualification dispute. The Supreme Court of Texas has recognized that the rule provides guidelines relevant to a disqualification determination.[34]

---

[32] Tex. Disciplinary R. Prof'l Conduct 3.08(a), *reprinted in* Tex. Gov't Code, tit. 2, subtit. G app. A (Vernon 2005).

[33] *Id.* cmt. 9.

[34] *Sanders*, 153 S.W.3d at 56.

Comment ten states that the rule "should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice."[35] For example, "a lawyer should not seek to disqualify an opposing lawyer by unnecessarily calling that lawyer as a witness."[36] And the supreme court has stated that disqualification is a severe remedy that "can cause immediate harm by depriving a party of its chosen counsel and disrupting court proceedings."[37] Accordingly, disqualification is only appropriate if "the lawyer's testimony is 'necessary to establish an essential fact'" and if the party requesting disqualification demonstrates "that the opposing lawyer's dual roles as attorney and witness will cause the party actual prejudice."[38]

In *Sanders*, a husband in a divorce proceeding arranged with his attorney to pay part of his legal fees by remodeling her offices.[39] The wife sought to disqualify the husband's attorney on the ground that as an employer of a party in a custody case, the attorney would be a material witness to establish

---

[35]▲ Tex. Disciplinary R. Prof'l Conduct 3.08(a) cmt. 10.

[36]▲ *Id.*

[37]▲ *Sanders*, 153 S.W.3d at 57.

[38]▲ *Id.*

[39]▲ *Id.* at 56.

whether his employment schedule would interfere with his parenting duties and his ability to pay child support.[40] The supreme court stated that, assuming such fact was "essential," the wife failed to explain why other sources in the record were insufficient to establish it, and accordingly, the trial court did not abuse its discretion by declining to disqualify the attorney on that ground.[41]

Here, as the party seeking disqualification, LOWT had the burden to show that Sawicki's testimony was necessary to establish a necessary fact and that Sawicki's dual roles as attorney and witness would cause it actual prejudice.[42] LOWT had to establish the reasonable value of the services that it provided to French. LOWT argued to the trial court that it had to call Sawicki as a witness because Sawicki's testimony "[went] to the very heart of what's at stake here," that Sawicki "[had] personal knowledge of what he did in this case, when he did it in the case, [and] how much effort he put into it," and that LOWT did not have any other witnesses who could testify about that.

But LOWT had other evidence to establish the reasonable value of its services to French. LOWT had boxes of documents produced by the LOWT lawyers and staff employees who worked on French's case, including Sawicki.

---

[40] *Id.*

[41] *Id*. at 57.

[42] *See id.*

24

LOWT had an expert witness to testify about the kinds of hours required for a medical malpractice case like French's, the work that Sawicki did at the firm, the quality of his work, the amount of time such work would have required, and the reasonable rates for such work. LOWT also had other attorneys and employees that it could have called to testify about work performed on French's behalf before Sawicki worked on the case, while Sawicki worked on the case, and after he left the firm. Thus, LOWT failed to show that calling Sawicki as a witness was *necessary* to establish the reasonable value of its services. Consequently, the trial court did not abuse its discretion by denying LOWT's motion to disqualify Sawicki from representing French. We overrule LOWT's second issue.

### III. French's Cross Appeal

In French's sole issue on cross-appeal, he argues that the trial court erred by entering a judgment not withstanding the jury verdict on his IIED claim because there is legally sufficient evidence to support the award.

**Standard of Review**

A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury finding on an issue necessary to liability or if a

directed verdict would have been proper.[43] A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue.[44]

To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review.[45] We must credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.[46]

**Analysis**

A plaintiff asserting a claim for IIED must prove that "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous;

---

[43] *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991).

[44] *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied).

[45] *See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003).

[46] *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *see Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

(3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe."[47] No claim for IIED can be maintained "when the risk that emotional distress will result is merely incidental to the commission of some other tort," and, "[a]ccordingly, a claim for [IIED] will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct."[48]

Conduct is extreme and outrageous if it is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[49] A court determining whether certain conduct is extreme and outrageous should consider the context and the relationship between the parties.[50] "'The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent

---

[47] *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999); *see also Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998).

[48] *GTE Sw.*, 998 S.W.2d at 611; *see also Standard Fruit & Vegetable*, 985 S.W.2d at 66.

[49] *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)); Restatement (Second) of Torts § 46 cmt. d (1965).

[50] *GTE Sw.*, 998 S.W.2d at 612.

27

authority over the other, or power to affect his interests.'"[51]  If a person does no more than insist on his legal rights in a permissible way, he cannot be liable for causing emotional distress in doing so.[52]

An attorney in Texas is permitted to seek recovery of a fee, either in contract or in quantum meruit, depending on how the relationship between the attorney and the client ended.[53]  Thus, LOWT had a legal right to seek recovery of at least the reasonable value of its services, subject to a defense that LOWT had abandoned its representation of French without just cause.   Even knowledge that, in doing so, it would cause French emotional distress does not make LOWT liable on an IIED claim.[54]

---

[51] *Id.* (quoting Restatement (Second) of Torts § 46 cmt. e).

[52] *Montemayor v. Ortiz*, 208 S.W.3d 627, 656–57 (Tex. App. — Corpus Christi 2006, pet. denied).

[53] *Hoover Slovacek LLP*, 206 S.W.3d at 561 ("[I]f an attorney hired on a contingent-fee basis is discharged without cause before the representation is completed, the attorney may seek compensation in quantum meruit or in a suit to enforce the contract by collecting the fee from any damages the client subsequently recovers."); *Royden*, 331 S.W.2d at 209 (stating that an attorney who abandons his client before the proceeding for which he was retained has been completed, or who commits a material breach of the employment contract, is not entitled to compensation for his services).

[54] *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817 n.20 (Tex. 2005); *Montemayor*, 208 S.W.3d at 656–57 ("We are unable to conclude that the pursuit of a remedy through legal process, however invasive, or even injurious, constitutes outrageous conduct beyond the bounds of decency, such as that which must be established to recover for intentional infliction of

Of course, the manner in which a party pursues its legal rights may sometimes be actionable,[55] but the supreme court has set a high bar for plaintiffs pursuing such a claim in the context of a dispute in a business relationship. In *Tiller v. McLure*, the supreme court addressed an IIED claim that arose out of a dispute over two commercial contracts.[56] McLure and her husband owned a business that contracted to do construction work for Tiller.[57] After McLure's husband was diagnosed with a malignant brain tumor, she sent Tiller a letter informing him of her husband's condition and designating herself as a contact person for concerns and complaints about the project. Tiller made "numerous and unpleasant" calls to McLure, all related to the contracts, that

---

emotional distress."). *But see, e.g.*, Tex. Disciplinary R. Prof'l Conduct 1.04 cmt. 19 ("If a procedure has been established for resolution of fee disputes, such as an arbitration or mediation procedure established by a bar association, the lawyer should conscientiously consider submitting to it.").

[55] *See, e.g.*, *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 78, 81–82 (Tex. App.—El Paso 1998, pet. denied) (holding that the acts of a credit card company's agent in attempting to collect on an account gave rise to an IIED claim when the agent made repeated calls to the debtor's place of employment after being asked to stop, once making twenty-six calls within a two-hour time period; made four or five calls to her home a day, sometimes before 6:30 in the morning and after 11 p.m. in the evening; used abusive language; told the debtor that the agent had put a contract out on her life; and called in a bomb threat to the debtor's workplace).

[56] 121 S.W.3d 709, 714 (Tex. 2003).

[57] *Id.* at 712.

were "self-centered and often unprofessional."[58] In none of his calls did Tiller directly attack McLure; rather, his complaints and threats all related to the project.[59] After McLure's husband died, Tiller learned that she intended to shut down the construction site for the day of the funeral so that company employees could attend.[60] Tiller objected and threatened to terminate the contract if she did so. Between McLure's taking over the lead on the project and the end of the project, Tiller telephoned her over sixty times. The court noted that Tiller's actions were "regularly insensitive, unreasonable, or otherwise wrongful" but, in context, did not rise to the level of extreme and outrageous.[61]

Furthermore, in *Creditwatch*, the supreme court held that the act of the plaintiff's former employer in orchestrating a post-termination eviction of the plaintiff was "callous, meddlesome, mean-spirited, officious, overbearing, and vindictive—but not 'so outrageous in character, and so extreme  in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

---

[58] *Id.* at 714.

[59] *Id.*

[60] *Id.* at 712.

[61] *Id.* at 715.

and utterly intolerable in a civilized community.'"[62] The court stated that "[w]e certainly understand judicial reticence to dismiss claims like this one stemming from heinous acts" but that "such acts will rarely have merit as intentional infliction claims," "except in circumstances bordering on *serious criminal acts*."[63] Pursuing a claim to be paid what one believes is owed him does not rise to the level of outrageous conduct required by the supreme court in an IIED claim.[64]

French argues that LOWT owed him a fiduciary duty and that its conduct must therefore be viewed with stricter scrutiny than the conduct of an individual in an ordinary relationship. The supreme court has instructed us that context matters in determining whether certain conduct is extreme and outrageous.[65] An attorney seeking recovery of a fee can, in theory, pursue

---

[62] *Creditwatch*, 157 S.W.3d at 817–18.

[63] *Id.* at 818 (emphasis added).

[64] *See Montemayor*, 208 S.W.3d at 656–57; *Gaspard v. Beadle*, 36 S.W.3d 229, 238 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (holding that sending a bill to a former client after ending a sexual relationship with her did not support an IIED claim; although the sending of the bill after breaking up with her "add[ed] insult to injury," the attorney believed he had a right to be paid for his legal work, and the court did not consider his actions to be extreme and outrageous).

[65] *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) (stating that, in reviewing IIED claims for legal sufficiency, a court considers the context and the relationship between the parties); *GTE Sw.*, 998 S.W.2d at 612

recovery in such a way that would constitute outrageous behavior.[66] But here it was only LOWT's pretrial refusal to agree to less than the contracted-for fee and its pursuit of its fee through judicial means that caused French's emotional distress. A pursuit of a legal right, done in a legally permissible manner, even if done with callous disregard for the emotional distress such pursuit will cause, will not subject an actor, even an attorney, to liability for IIED.[67] Furthermore, the actions complained of by French as causing his emotional distress all occurred after the attorney-client relationship between French and LOWT had ended.[68]

LOWT did put French in a position that the jury may have considered unconscionable: by asserting its right to a 40% recovery, LOWT left French with potentially oppressive alternatives of choosing, at the extreme, a much smaller share of recovery or an attorney with much less experience who was willing to accept a much smaller contingency fee. After putting French in such a position, LOWT then refused to accept the case back, so that if French went forward with his case and won, he would be forced to pay (if LOWT

---

(quoting Restatement (Second) of Torts § 46 cmt. e (1965)).

[66] *See, e.g.*, *Household Credit Servs.*, 989 S.W.2d at 81–82.

[67] *See Wornick Co. v. Casas*, 856 S.W.2d 732, 735 (Tex. 1993).

[68] *See Hall v. Stephenson*, 919 S.W.2d 454, 465 (Tex. App.—Fort Worth 1996, writ denied) (noting general rule that an attorney has no duty to a client after the attorney-client relationship has ended).

successfully recovered its share) for more than one attorney. After intervening in the Tarrant County lawsuit, LOWT filed a separate lawsuit in Dallas County, subjecting French to not one but two lawsuits over the same fees, one of which was found to be frivolous. The jury, faced with an attorney who would put a client in such a position, especially an older client involved in a lawsuit over the unexpected loss of his spouse, may have felt that the attorney's behavior was outrageous, atrocious, and utterly intolerable. But the law in this state provides that a party pursuing its legal rights in a permissible way is not outrageous conduct per se, and we must apply that law.

French argues that none of the acts of LOWT in pursuing payment were justified, "let alone reasonable." That may be so, but neither were they outrageous enough in character to meet the standards for an IIED claim as set out by the supreme court in *Tiller* and *Creditwatch*.[69] We overrule French's sole issue.

## IV. Conclusion

Having overruled French's sole issue on appeal, we affirm the trial court's judgment notwithstanding the verdict on French's IIED claim. Having sustained LOWT's first issue, we reverse the trial court's take-nothing judgment on LOWT's claim and remand for a new trial on LOWT's quantum meruit claim.

---

[69] *See Creditwatch*, 157 S.W.3d at 817–18; *Tiller*, 121 S.W.3d at 715.

                                    LEE ANN DAUPHINOT
                                    JUSTICE

PANEL:  LIVINGSTON and DAUPHINOT, JJ.

DELIVERED:  March 4, 2010