

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-10-00116-CV

JIMMIE D. BENNETT AND
JUNE BENNETT

APPELLANTS

V.

WISE COUNTY, COMMISSIONER
MIKEL RICHARDSON IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITIES, COMMISIONER
DANNY WHITE IN HIS OFFICIAL
CAPACITY, AND ROBERT RANKIN

APPELLEES

----------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants Jimmie D. Bennett and June Bennett appeal from the trial court's judgment that they take nothing on their claims against Appellees Wise County (the County), commissioner Mikel Richardson (in his official and

---

[1]*See* Tex. R. App. P. 47.4.

individual capacities), commissioner Danny White (in his official capacity), and former commissioner Robert Rankin. The Bennetts bring four issues on appeal, all based on their assertion that the evidence showed that County Road 4393 in Wise County included a bridge over the West Fork of the Trinity River. Because we hold that the Bennetts did not establish as a matter of law that the bridge was a part of the county road, we affirm.

## Background

This appeal arises out of the collapse of a bridge and a jury's determination that the bridge was not part of County Road 4393 in Wise County. The bridge ran in a north/south direction across the West Fork of the Trinity River. Before the bridge collapsed, it could be reached on the north side of the river by way of County Road 4393. The bridge connected on the south side of the river to property owned by J.L. McGilvray.

The Bennetts own property that is just south of the West Fork and just west of McGilvray's property. The Bennetts' property is not contiguous to any public road. They have an easement over McGilvray's property to access the bridge.

In September 2005, the bridge caved in on its south side. In January 2006, the Bennetts and some of their neighbors applied to the Commissioner's Court of Wise County to open a new public road under section 251.053 of the transportation code. No record of the disposition of this application appears in the record, but the Bennetts alleged below that the application was denied on the

2

ground that they had an easement over the McGilvray property to access another road.

The Bennetts sued the County and commissioners Richardson and Rankin, individually and in their official capacities. After White replaced Rankin as commissioner, the Bennetts supplemented their petition to sue White in his official capacity. The Bennetts claimed that County Road 4393 included the bridge until September 2005, when the County "through its commissioners . . . closed and removed the Trinity River bridge and all of County Road 4393 south of the bridge." The Bennetts alleged that they do not have and have not had an easement over the McGilvray property to any public road but County Road 4393.

The Bennetts sought a declaration that County Road 4393 included the bridge and that the County had closed the road and thereby interfered with their rights of ingress and egress. They also sought a temporary injunction enjoining the County and the commissioners from depriving them of access to their property from a public road during the pendency of the suit and a permanent injunction enjoining the County and the commissioners from interfering with their use "of the public ways described." They also asserted a claim for inverse condemnation based on the road closure and sought damages for the reduction in value of their property, lost rents, and lost livestock. The Bennetts filed a supplemental petition seeking mandamus relief requiring Appellees to maintain County Road 4393 "in traversable condition for its full .9 miles length."

3

The case was tried to a jury. At the end of the Bennetts' case, Rankin moved for directed verdict on the claims against him, and Richardson moved for directed verdict on the claims against him in his individual capacity; the trial court orally granted both motions. With respect to the Bennetts' remaining claims, the jury found that when the bridge collapsed, County Road 4393 did not extend across the river. The Bennetts filed a motion for judgment notwithstanding the verdict (JNOV). The trial court entered judgment on the verdict and ordered that the Bennetts take nothing. The Bennetts then filed a motion for new trial, which was denied by operation of law. This appeal followed.

**Analysis**

**Motion for JNOV**

All of the Bennetts' issues are based on their assertion that County Road 4393 included the bridge. In their second issue, the Bennetts argue that the trial court erred by denying their motion for JNOV when the evidence established as a matter of law that County Road 4393 crossed the river. They contend that there was no basis for the jury to conclude that the bridge was not part of the county road when every source shows that County Road 4393 was a county road for its full length, that the official maps of the county show the road crossing the river, and that the county periodically maintained the road, including the bridge.

A trial court may disregard a jury verdict and render JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict

4

would have been proper.[2]  A directed verdict is proper only under limited circumstances:  (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue.[3]  In other words, we must apply the legal sufficiency standard of review.[4]

The Bennetts had the burden of proof on this question, and therefore, in challenging the legal sufficiency of the jury's finding, they must show on appeal that the evidence established as a matter of law all vital facts in support of their issue.[5]  We view the evidence in the light most favorable to the verdict,[6] and we must credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.[7]

---

[2]*See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

[3]*See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003); *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied).

[4]*See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999) (setting out the standard for legal sufficiency).

[5]*See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

[6]*Miller*, 102 S.W.3d at 709.

[7]*Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *see Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

The jury was asked whether, at the time the bridge fell into the river, County Road 4393 extended across the river. When the bridge fell, the County had not adopted the map that the Bennetts argue made the bridge part of the county road. The map was therefore irrelevant to the jury's determination of the question. We therefore look at the other evidence at trial to determine whether the evidence, viewed in the light most favorable to the verdict, established the Bennetts' right to judgment as a matter of law.[8]

*Testimony Relating to the Bridge*

The jury heard conflicting testimony about the bridge. Phyllis Morris, the 911-addressing coordinator for the County, testified that forty years earlier, when she was in high school, she and her classmates would sometimes socialize on the bridge, which they accessed by climbing over a gate on the north end of the bridge. Calvin Buchanan, who had been living in the County for fifty-five years at the time of trial, testified that starting in the mid-1970s, he had begun leasing the property now owned by the Bennetts and that he had continued leasing the property until the Bennetts bought the land. He testified that he probably used the bridge more than fifty times a year to get back and forth to the hay he grew on the land, and on "good years" probably a hundred times. He testified that he and the property owner did repair work on the bridge annually. He knew of only one occasion when the County did any repair work on the bridge, and that had

---

[8]*See Islas*, 228 S.W.3d at 651; *see also Tanner*, 289 S.W.3d at 830.

6

occurred when a prior commissioner had had a few timbers replaced. Buchanan stated that at one time it was "customary" for the County to fix a private road or even "anybody's driveway" if requested.

Buchanan further testified that when he first started leasing the property, there was a gate at the far north end of the road. He also testified that he thought he and the property owner took it down at some point; "it disappeared." There was another gate on the bridge; at some point the gate was in the middle of the bridge, but later the gate was on the south end of the bridge. He testified that the prior owner had offered to sell him the property but he had turned down the offer because he did not want to be responsible for maintaining the bridge, which he had assumed was not a part of the county road "because they hadn't maintained it in years, to [his] knowledge."

Henry Porter testified that his family has owned property in the County for over a hundred years. Porter does not live in the County, but he acquired property near what is now the Bennetts' property in 1986 and has visited the area throughout his life.[9] Porter testified that he remembered a gate being in the middle of the bridge in 1948 (when he was ten years old) and that at some point, the gate was moved to the south end of the bridge. Porter also testified that once a county commissioner rebuilt the bank on the north end of the bridge. He also testified that at some point, another road provided access to property on the

---

[9]Porter is also suing the County for access to his property, seeking to compel the County to build a road south of his property.

south side of the river but that in 1937, a number of landowners (including his family) asked the County to "discontinue" it.

Rankin testified that in 2005, before the bridge collapsed, Bennett notified him about a jam under the bridge, and as a result, he looked into whether the bridge was a private bridge or part of County Road 4393 in order to determine whether he could authorize spending county money on it.[10] Rankin looked at records from the Texas Department of Transportation and determined that the bridge was not listed in that agency's system as a county bridge. He talked to the foreman and two other employees of his road crew, who told him that it was a private bridge. The same employees told him that a former commissioner—the same commissioner identified by Buchanan—had once had some planks replaced on the bridge even though they told him that it was a private bridge. Rankin also talked to several residents about the bridge, including one resident who was over eighty years old. Based on his research, he determined that the bridge was not a part of the county road.

Thus, two long-time residents testified that the bridge had been gated for years. Buchanan testified that in the time that he had leased the property, it had been the private property owner who did annual repair work on the bridge. A

---

[10] *See Louisiana-Pac. Corp. v. Newton Cnty.*, 149 S.W.3d 262, 264 (Tex. App.—Eastland 2004, no pet.) (noting that "[i]f a commissioners court spends money on a road without knowing whether the road is a public road or a private road, it risks violating the prohibition against county maintenance of private roads").

county commissioner researched the issue and found no indication that the public, county employees, or the Texas Department of Transportation believed that the bridge belonged to the County. Although the Bennetts argue that the evidence showed that the County maintained the bridge, the record does not support that assertion. There was some evidence that the County had done some repair work on the road leading to the bridge, including the part of the road adjacent to the bridge, but the only evidence showing any repair work on the structure of bridge itself was the testimony of Buchanan and Rankin that a commissioner had caused some planks on the bridge to be replaced. The testimony at trial, viewed in the light most favorable to the verdict, does not show as a matter of law that the bridge was part of the county road when it fell into the river.

*Documentary Evidence Relating to the Bridge*

In addition to testimony, both sides also introduced documentary evidence of maps and property records of the County. A number of the property records admitted reference a bridge, but neither side established as a matter of law that the references in the records to a bridge were referring to the bridge at issue here. Nor do the records establish the ownership of the bridge as a matter of law. Some of the documents are difficult if not impossible to read, and no one explained how the documents show a chain of title.

In their brief, the Bennetts argue that Defendants' Exhibit 8 "shows a conveyance of a bridge to the county judge and his successor[s] in office."

9

Defendants' Exhibit 8 is a deed purporting to convey "the Garvin Bridge, across the West Fork of the Trinity river and more particularly described in a certain deed from H. W. Tarlton et ux, to E. G. Gasperson . . . to . . . J. A. Simmons, County Judge of Wise County, Texas and his successors in office." The deed states that the bridge is "more particularly described in a certain deed from H. W. Tarlton et ux, to E. G. Gasperson, dated December 1st, A. D. 1944, and recorded in Volume 157, page 165 of the deed records of Wise Co." Appellees introduced into evidence a deed from Tarlton to Gasperson that was dated December 1, 1944 and that conveyed eight tracts of land. But although the descriptions of some of these tracts mention the river, none describe a bridge. Thus, it was not demonstrated as a matter of law that the bridge referenced in Defendants' Exhibit 8 is the same bridge at issue in this case. Porter added to the confusion when he gave his opinion that the bridge referenced in minutes from a December 1938 commissioners court meeting, in which the county voted to sell the bridge "on abandoned Garvin Road" to H.M. Tarlton for $150 was an entirely different bridge altogether, one that no longer exists.

Furthermore, the deed in Defendants' Exhibit 8 states that title "shall vest in the said grantee absolute, if, as, and when the grantee shall repair the said bridge to render the same safe and practical for nominal traffic across." The Bennetts have pointed us to no evidence in the record, and we have found none,

10

that the County repaired the bridge as required for its interest to vest under the deed.[11]

Defendants' Exhibit 10, which the Bennetts argue shows that the bridge and the county road are "inseparably linked," is not a deed but is instead an assignment of a deed of trust to F.M. and Onace McGilvray. It does not convey property but does include a description of property affected by the deed of trust. Part of this description references a line "to the center of an old bridge in Block 39; THENCE with center of county road North 55 degrees 52 minutes." The description does not more particularly describe what bridge is referenced or which county road is meant. The description begins by stating that it is a "tract of property known as the Pope and Murray Ranch in the Van Zandt County School Land Survey, Abstract 1182, in Wise County, Texas." But we have not found and the Bennetts have not pointed to anywhere in the record demonstrating that the bridge and country road mentioned in the property description are the same bridge and county road at issue in this case.

Plaintiffs' Exhibit 14 is a map of blocks 38 and 39 of the Van Zandt County School survey. The map lists a "Decatur & Garvin Road" and indicates the road

---

[11]*See Clark v. Womack*, 142 S.W.2d 954, 957 (Tex. Civ. App.—Amarillo 1940, writ dism'd, judgm't cor.) (noting that "a deed may contain one or more conditions which must be performed before the title to the property therein described vests in the grantee by such conveyance and the grantor may require any lawful condition he may elect"). Because the parties do not raise the issue, we do not discuss whether this deed would implicate the rule against perpetuities. *See Kelly v. Womack*, 153 Tex. 371, 375, 268 S.W.2d 903, 905 (1954) (defining the rule against perpetuities).

runs into a bridge across what appears to be the Trinity River. The map does not show any road, county or otherwise, to which the bridge connects on the other side of the river.

As the Bennetts point out, the easement given to them by McGilvray does state that it begins "at the bridge across the river on County Road 4393 running, more or less, along the river bank, as it may change from time to time, to an existing steel gate on the boundary line of Grantors' property and [Grantees' property]." In the easement, the Bennetts "agree to keep their lock on gate at County Road 4393 locked." But the description does not unequivocally indicate that the bridge is part of the county road, and even if it did, the description is merely a description of the easement—it does not convey or dedicate the bridge to the County.

Based on this evidence, we cannot say that the trial court erred by concluding that the Bennetts had not shown as a matter of law that the bridge was part of a county road when it fell into the river.[12]

*The County's Adoption of a Map*

Because the evidence is sufficient to support the jury's finding that the bridge was not part of County Road 4393, we could only sustain the Bennetts' issue if, notwithstanding the jury's answer to that question, the County's adoption

---

[12]*See Islas*, 228 S.W.3d at 651; *see also Tanner*, 289 S.W.3d at 830.

12

of the map created in the County a duty to rebuild the bridge after it collapsed.[13] The Bennetts do not expressly argue that the trial court should have entered a judgment in their favor on the ground that the County took on such a duty. But they implicitly make the argument because they argue that the County's adoption of the map extended the county road across the river and therefore caused the bridge to become part of the county road. Assuming that is a true statement of the law, it would not help the Bennetts unless it also created a duty in the County to rebuild the bridge, considering that the County did not adopt the map until after the bridge had already fallen into the river. We will therefore consider this argument. The statute relied on by the Bennetts, however, does not create any such duty in the County.

Before 1981, a county could use its continuous maintenance of a road during the prescriptive period as a factor to show the county's adverse possession of the road.[14] In 1981, the legislature adopted a statutory scheme,

---

[13]*See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (stating that a trial court may disregard a jury finding if the issue is immaterial and that a question is immaterial if it was properly submitted but has been rendered immaterial by other findings); *Fire Ins. Exch. v. Sullivan*, 192 S.W.3d 99, 105 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (noting that the trial court's judgment must conform to the evidence).

[14]*See, e.g.*, *Turner v. Live Oak Cnty.*, 107 S.W.2d 1103, 1105 (Tex. Civ. App.—San Antonio 1937, writ dism'd) (affirming trial court's judgment that the county had a prescriptive easement on property that it had graded and worked on for more than ten years and that the public had used for that period); *Tex. & P. Ry. Co. v. Kaufman Cnty.*, 17 Tex. Civ. App. 251, 254–55, 42 S.W. 586, 587 (Tex. Civ. App.—Austin 1897, no writ) ("It was long ago decided in this state that the character of a public road may be established as such by long-continued use

now codified in chapter 281 of the transportation code, setting out the manner in which a county with a population of 50,000 or less could acquire a public interest in a private road.[15]  The chapter provides that such counties can do so only by purchase, condemnation, dedication, or a court's final judgment of adverse possession—and for purposes of this chapter, using public funds to maintain a private road in which a public interest was not recorded does not constitute adverse possession.[16]  In other words, no longer may a county with a population under 50,000 establish the existence of a prescriptive easement over a road by showing that the county had continuously used public funds to maintain it throughout the limitations period.

---

[by the public] and by orders of the commissioners' court assigning hands to work it as a public road."); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 16.026 (West 2002) (providing ten year limitations period to bring suit to recover real property "held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property"); *Ramirez v. Calhoun Cnty.*, No. 13-09-00018-CV, 2009 WL 5135632, at *6–8 (Tex. App.—Corpus Christi Dec. 29, 2009, no pet.) (mem. op.) (affirming the trial court's finding of a county's prescriptive easement on property when the public had used the property and the county had maintained it for over ten years); *Eastex Wildlife Conservation Ass'n v. Jasper*, 450 S.W.2d 904, 907 (Tex. Civ. App.—Beaumont 1970, writ ref'd n.r.e.) ("A road not originally established under the statute may become public by long-continued use and adoption as such by the county commissioners with the assent of the owner or by prescription.") (quoting *Worthington v. Wade*, 82 Tex. 26, 28, 17 S.W. 520,  521 (1891)).

[15]*See* Act of May 31, 1981, 67th Leg., R.S., ch. 613, §§ 1–7, 1981 Tex. Gen. Laws 2412, 2412–13 (current version at Tex. Transp. Code Ann. §§ 281.001–.007 (West 1999)).

[16]Tex. Transp. Code Ann. §§ 281.002, .004.

The statute is not retroactive,[17] and thus a county affected by chapter 281 may still assert any prescriptive easements it had established prior to 1981. But if a county wants to establish its easement in a legal proceeding, then, as the party asserting the easement, the county still has the burden to prove that it maintained the road prior to that time in the manner required to show a prescriptive easement.[18]

More than twenty years later, the legislature was apparently concerned that no statute of limitations existed for a landowner to bring suit to challenge a county's prescriptive easement and that as a result, "[i]n the future, as counties are unable [to] produce personal testimony with firsthand knowledge, they will be more likely [to] lose in court."[19] The legislature provided a solution by adopting chapter 258 of the transportation code.[20] This chapter established a method by which a county could adopt a map and thereby clarify a public interest in a road that it acquired either by one of the methods in chapter 281 or some other law *or*

---

[17]*See* Act of May 31, 1981, 67th Leg., R.S., ch. 613, § 7, 1981 Tex. Gen. Laws 2412, 2413.

[18]*See Wright & Vaughn v. Fanning*, 86 S.W. 786, 787 (Tex. Civ. App.— Dallas 1905, no writ) (putting the burden on the party asserting the easement to establish the elements of an easement).

[19]*See* Senate Comm. on Infrastructure Development & Security, Tex. H.B. 1117, 78th Leg., R.S. (2003), *available at* http://www.legis.state.tx.us/tlodocs/78R/analysis/html/HB01117E.htm.

[20]*See id.*; *see also* Act of May 20, 2003, 78th Leg., R.S., ch. 236, § 1, 2003 Tex. Gen. Laws 1070, 1070–72 (creating chapter 258).

by having continuously maintained the road prior to 1981.[21] The chapter limited the period of time after a county adopts a road map under this chapter that a landowner could bring suit to contest the county's assertion of public interest in a road listed on the map.[22] Thus, by adopting such a map, a county could create a time limitation on potential challenges to prescriptive easements claimed by the county. As of September 1, 2011, this option is no longer available.[23]

Nothing in the statutory scheme supports the Bennetts' interpretation of the chapter—that the county can accidentally create a public interest in a road by adopting a map and thereby be forced to build a bridge on the road. Chapter 258 begins with the statement that "a county may clarify the existence of a public interest in a road as provided by this chapter."[24] Thus, by its plain language, the chapter's purpose is to benefit the county by providing a method for it to clarify that a road is, in fact, a public road, even though the county has not adopted the road by the methods proscribed by statute. But nothing in the chapter indicates an intent by the legislature to allow a county to *inadvertently* adopt a road or to allow a private individual to use the chapter to require a county to maintain a road. The chapter, when read in its entirety, is clearly intended to provide a

---

[21]Tex. Transp. Code Ann. § 258.002 (West Supp. 2011).

[22]*See id.* § 258.004 (West Supp. 2011).

[23]*Id.* § 258.007 (West Supp. 2011) (providing a limitation on the period of time in which a county may take advantage of the chapter's provisions).

[24]*Id.* § 258.001 (West Supp. 2011).

manner for a county to establish that a road is a county road when that county has not adopted the road in the manner otherwise provided by law but has continuously maintained the road from before 1981 until the time it promulgates the map including the road.[25]

The county must, for example, include a notice of its intention to consider adoption of the county road map in the ad valorem tax statements for the year *before* the adoption of a county road map under the chapter.[26] This notice "must include a list of all roads in which the county will claim the existence of a public interest by adoption of the map."[27] The chapter further requires the commissioners court to hold a public meeting at which a person asserting a private interest in the road may protest the county's claim.[28] The burden is on the county to prove the county's continuous maintenance of the road beginning before September 1, 1981.[29] And after a county has adopted a county road map claiming a public interest in a road, the commissioners court must include

---

[25] *See id.* §§ 258.001–.007 (West Supp. 2011).

[26] *Id.* § 258.005(a).

[27] *Id.*

[28] *Id.* § 258.002(b).

[29] *Id.* § 258.002(b), (h).

another notice of that fact with the ad valorem tax statements for the year after the year in which the county adopts the map.[30]

Furthermore, if a person had a private right, title, or interest in the road prior to the county's successful assertion of a public interest in the road by way of the adoption of the map, then, if the county ceases to maintain the road, the private right, title, or interest reverts completely to the person who held title at the time the county successfully asserted the public interest.[31] Thus, not only does this chapter clearly not support the Bennetts' claim that they can force a county to build a bridge by the county's inadvertent inclusion of the bridge on a county map adopted under chapter 258, but when the county stopped maintaining the bridge (if it ever did maintain it), then the bridge reverted back to private ownership.

The Bennetts argue that the chapter provides that the adoption of a map under the chapter is "conclusive evidence" that the road is a public road, and therefore the County must construct a new bridge. But the provision relied on by the Bennetts does not, as they suggest, provide a way for a private individual to require the county to adopt a road it did not intend to adopt. The statute states that a map adopted under the chapter is conclusive evidence (except as against a private individual claiming an interest in the road) of the public's right of access

---

[30]*Id.* § 258.005(b).

[31]*Id.* § 258.006.

over the road and of the county's *authority* to spend funds to maintain the road; it does not state that it is conclusive evidence of the county's duty to maintain the road.[32] This section does not, therefore, require the County to build a bridge.

And in any case, the evidence at trial did not establish as a matter of law that the County continuously maintained the bridge from before 1981 until the time it promulgated the map including the bridge as a part of the county road, nor that it had established a public interest in the road by way of any other law.[33] Thus, even if this chapter can be used to force a county to build a bridge when it includes the bridge as a part of its county map, the Bennetts failed to establish that the county met the requirements under the chapter for the County to clarify an interest in the bridge by including it on the map.[34] The Bennetts make no argument that the evidence established as a matter of law that the County acquired the bridge by purchase, condemnation, dedication, or a final judgment of adverse possession or under some other law.

Because (1) the evidence was sufficient to support the jury's verdict that County Road 4393 did not cross the bridge at the time of the bridge's collapse and (2) the statutory scheme relied upon by the Bennetts does not require the County to extend the road by building a bridge, the trial court did not err by

---

[32] *See id.* § 258.003.

[33] *See id.* § 258.002.

[34] *See id.*

denying the Bennetts' motion for JNOV.  Accordingly, we overrule the Bennetts' second issue.

**Motion for New Trial**

In their third issue, the Bennetts argue that the trial court erred by denying their motion for new trial when the evidence established as a matter of law that County Road 4393 crossed the river.  They contend that "there is no conflicting evidence with the official maps of the County depicting County Road 4393 going across the river" and that "presumably to this day, County Road 4393 still crosses the river—but the County is refusing to maintain it for its full length (including the bridge)."  But as we discussed above, a county cannot inadvertently create a public interest in a private road by adopting a county map. For the reasons we discussed in addressing the Bennetts' second issue, we hold that the trial court did not abuse its discretion by overruling their motion for new trial because the evidence did not establish as a matter of law that County Road 4393 crossed the river.[35]  We overrule their third issue.

**Mandamus or Injunctive Relief**

In their first issue, the Bennetts argue that the trial court erred by refusing to grant the mandamus or injunctive relief in their favor because the evidence conclusively showed that the County had designated County Road 4393 to cross

---

[35]*See Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009) (reviewing a trial court's refusal to grant a motion for new trial for abuse of discretion); *see also Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004) (setting out the standard of review for abuse of discretion).

the river.  We have already held that after the bridge fell into the river, the County did not have a duty to rebuild it.  We therefore overrule this issue.

**Motion for Directed Verdict**

In their fourth issue, the Bennetts assert that the trial court erred by granting Rankin's and Richardson's motions for directed verdict as to the claims against them in their individual capacities.  The Bennetts argue that former commissioner Rankin put up a "road closed" sign and a crossbar gate to close access to the lower portion of County Road 4393 and that Richardson's road crew piled dirt in front of the bridge. These statements relate to the Bennetts' claim that Rankin closed the bridge and the portion of the road south of the bridge without designating a road as a replacement.  The Bennetts also argue that the County has ceased maintaining the bridge, and "[i]f that decision was made unofficially, it was done ultra vires."

Rankin testified that he had the "road closed" sign put up for safety reasons.  He explained that when the bridge caved in, Richardson (the commissioner for the area south of the bridge) decided to haul it out of the river because it was causing erosion to McGilvray's property and "was definitely a problem."  The crew set it on the road, and Rankin then had the sign put up because the bridge was "sitting in the middle of" the road, and he was concerned about resident safety.  He later put up a crossbar gate at the request of a County Road 4393 resident who complained about people parking by the bridge in the road and poaching on his property.  Rankin told the resident that he could not

21

permanently block off the road but could put up a temporary gate. This gate was placed south of the resident's driveway, and there are no other driveways on the road between the gate and the river. Thus, the road was not permanently closed, and the only part of the road that could not be accessed was the portion of the road south of the resident's driveway and ending at the river. As for closing the bridge, the Bennetts failed to establish as a matter of law that the bridge was part of County Road 4393, and therefore the County did not have any obligation to designate a replacement road for the bridge.[36] As for the Bennetts complaint that the County has ceased maintaining the bridge, as stated above, the Bennetts failed to establish as a matter of law that the bridge was part of County Road 4393 and that the County had any obligation to maintain the bridge. We overrule the Bennetts' fourth issue.

## Conclusion

Having overruled all of the Bennetts' issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DELIVERED: November 10, 2011

---

[36]*See* Tex. Transp. Code Ann. § 251.051 (West 1999) (prohibiting a commissioners court from discontinuing a *public* road until a new road designated by the court as a replacement is ready to replace it).