Opinion issued October 15, 2009









 






In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00378-CV






JOSE HERMILO REQUENA AND MARY SUE REQUENA, Appellants


V.


OTIS ELEVATOR COMPANY, Appellee






On Appeal from the 215th District Court

Harris County, Texas

Trial Court Cause No. 2006-23862






O P I N I O N


 Appellant, Jose Hermilo Requena, sued Otis Elevator Company ("Otis") for
negligence after he was hurt using an industrial freight elevator. The trial court
granted Otis's motion for judgment notwithstanding the verdict after the jury returned
a verdict in favor of Requena. Requena argues in his sole issue that the trial court
erred in granting Otis's motion for judgment notwithstanding the verdict. (1)

 We affirm. 

Background

 Requena was an employee of Linbeck Construction Company, a contractor on
the premises of St. Luke's Episcopal Hospital in Houston, Texas. On October 26,
2004, Requena's supervisor asked him and two co-workers to move some building
materials using the hospital's service elevator. The service elevator had both a bi-parting door that opened and closed horizontally and a bi-parting safety gate that
opened and closed vertically. Both the door and the gate closed when the elevator car
moved. The elevator was designed to stay at a floor when the doors were left open,
but a person on another floor could call the elevator and cause the door and gate to
close and the elevator to start moving. The call button was designed to sound a
buzzer to alert passengers on other floors that the elevator door and gate were about
to close. When the button was depressed for a certain length of time, the buzzer
would sound and the elevator door and gate would close. 

 While Requena and his co-workers were loading the materials into the service
elevator, an employee from another contractor, Fisk Electric Company ("Fisk"),
pressed the elevator button to call the elevator to the basement. Requena was
standing on the threshold of the elevator attempting to maneuver the building
materials into the elevator at a 45-degree angle when he and his co-workers heard the
buzzer sound numerous times. Requena and his co-workers yelled to the Fisk
employee that they were using the elevator, but the Fisk employee pushed the call
button in the basement, causing the buzzer to sound continuously for one to two
minutes. The elevator gate then closed and the upper part of the gate struck Requena
and injured his neck and back. Requena sued Otis, alleging that it was negligent in
maintaining the elevator. (2) Requena's wife, Mary Sue Requena, also sought to recover
damages against Otis based on loss of household services and loss of consortium.

 Trial began on February 27, 2008. At trial, Requena testified that he heard the
buzzer, and, when asked whether he had ample time to get out of the way after
hearing the buzzer, he responded, "The bell is designed to let you know that
somebody is calling for [the elevator]. That's what the bell is designed. So, what we
did, we hurried it up so we could move and get out of the way and move on down to
wherever it was going." Requena testified that neither of his co-workers had time to
warn him that the doors were closing and that the doors closed too fast for him to
move out of the way. On cross-examination, Requena testified that it was standard
practice at the time of the accident for someone wishing to call the elevator to press
the buzzer three times as a warning and then to hold the button down to actually call
the elevator. He testified that, prior to the door's closing on his neck, he had heard
the buzzer sound at least three times. He also testified that the buzzer sounded for
one to two minutes prior to the gate's descent. He knew that when the buzzer
sounded the elevator doors would soon close, and he testified that it was "standard
practice" for all the workers to step out of the threshold of the elevator door when the
buzzer sounded. He also testified that there was enough room for him to move into
the elevator. He further testified that if he had followed standard practice at the time
of the accident he would not have been struck by the elevator gate.

 Requena testified that he sought medical care immediately after the accident
and was initially diagnosed with a strain. He was prescribed pain medicine and anti-inflammatory drugs, and he returned to work two days later. At a doctor's visit
sixteen days after he was struck by the elevator, Requena reported to his physician
that his neck felt "a whole lot better." Approximately four days after he reported that
his neck was getting better, Requena reinjured himself while cutting countertop
materials with a band saw. His physician treated him with more pain medication and
injections in his neck and back, and he underwent an MRI and various x-rays. He
was eventually diagnosed with two herniated disks in his neck and underwent surgery
to correct the herniated disks. Requena testified that he has suffered constant pain in
his neck since the accident with the elevator doors. 

 Requena also testified that he had seen the elevator doors strike other people
in the past, and that he had "brought it up" with "the maintenance guy that was
housed there at St. Luke's." (3) Requena did not testify regarding his specific
conversations with this mechanic because the trial court sustained Otis's hearsay
objection to them.

 Requena also presented testimony from Vincent Garza, an Otis mechanic
assigned to work on the elevator system at St. Luke's Hospital. Garza testified that
he performed maintenance on the service elevator on a "callback" basis. Garza
testified that he would "visit the elevator upon a request for a call and try to
troubleshoot and pinpoint deficiencies or[,] if it wasn't running, get it running." He
testified that a pressure gauge could be used to adjust an elevator door or gate, but he
did not carry a stop watch or pressure gauge in his tool box. He also testified that a
"gate closing too fast" would be a hazard to elevator users, and he discussed his
general procedure for addressing complaints that an elevator's doors were closing too
quickly. However, Garza did not testify about the condition of the particular elevator
doors that struck Requena.

 Requena also presented testimony from Brian Hebert, Vincent Garza's
supervisor at Otis. Hebert testified that Garza has been employed by Otis for 25 years
and that he had been Garza's supervisor for three years. He testified that all Otis
employees must read specifications on Otis equipment to maintain the equipment
properly. However, the service elevator was not an Otis elevator, and Otis had no
maintenance plan for the elevator. He testified that St. Luke's Hospital had the
responsibility to maintain the safety of the elevator operating system and that Otis had
the responsibility "[t]o perform maintenance and repairs on that elevator, to perform
annual inspections on the elevator, with the inspecting authority." He also testified
that St. Luke's made its own decisions regarding the scheduling of routine
maintenance and it did not use the "Otis Maintenance Management System" to
schedule maintenance. Instead, St. Luke's used internal scheduling processes based
on the amount of "usage of the elevator" to manage the elevator's maintenance. 
Regarding routine maintenance, Hebert agreed that Otis's maintenance records
showed that routine maintenance had been completed on November 18, 2003, January
8, 2004, April 8, 2004, July 30, 2004, and December 14, 2004. He further agreed that
it "appear[ed] that bimonthly-scheduled procedures were not documented . . . because
St. Luke's Hospital had [its] own documentation. So if there was a service [call]
while you were there and you did preventative maintenance, you would document it
on their paperwork rather than Otis'." He then testified, "These are not our elevators. 
These elevators belong to St. Luke's Hospital. We only maintain the elevators, we
don't own them. These elevators were operating as designed and installed according
to the City of Houston inspector."

 Hebert testified that a reasonable pressure reading for a closing elevator door
is "less than 30 pounds" and that he was unsure if Garza inspected the door weight
or closing speed. He testified that the American National Standards Institute, the City
of Houston, and the State of Texas "all said that inspecting the speed of the [elevator]
doors a minimum of once a year is a good requirement." He testified that an Otis
mechanic who notices an unsafe condition is supposed to notify his supervisor, and
the following exchange occurred.

Q. [W]ouldn't it be the responsibility of Otis who's maintaining the
elevator to make sure that it's working properly?


A. If we saw the problem or if the problem were brought to our
attention by the owner of the elevator, it would be our
responsibility to correct it.


Hebert further testified that the speed of the elevator door and gate was checked
annually by a City of Houston inspector. However, Hebert did not testify about any
specific complaints or service calls regarding the elevator that struck Requena.

 Finally, Requena presented expert testimony from Richard Baxter, an elevator
consultant and qualified elevator inspector who had previously worked for Otis. 
Baxter testified that the American National Standards Institute A17.1 safety code for
elevators contains the industry standard for door forces, including door speeds, and
that the City of Houston inspects elevators based on this standard and others. He
testified that Otis had a duty to warn St. Luke's of any hazards involving the elevator
door or gate. He further testified that "Otis knew that they were having problems
with the elevator, that the elevator had been reported. Vince Garza reported it to his
supervisor, Brian Hebert, that the elevator was hitting people; and they took the
position in their depositions that it was only a nuisance that the elevator doors--the
elevator gate was striking people." Baxter opined that "if you strike somebody
enough, at some point in time you're going to injure somebody; and that's exactly
what took place." He also opined that Hebert and Garza were negligent for not
having warned St. Luke's of the fact that the doors or the gates were striking
passengers. (4)

 Baxter testified that he had never done an inspection of the elevator, but that
he did review maintenance records. He also testified that there was no indication that
any inspecting authority had found any violations regarding the elevator's operation,
that on the day of Requena's incident there was nothing wrong with the elevator, and
that "the elevator probably behaved the way it was designed." He further testified
that the elevator was "code-compliant and safe" in the manner in which the warning
system and door-closing mechanism operated.

 On cross-examination, Baxter testified that the service elevator "was not only
safe but it was compliant with [the safety] code" under which the elevator was
installed. He also testified that he had"no idea" about the rate of the door speed or
the measure of other door forces at the time of the incident. 

 At the end of Baxter's testimony, Requena rested his case. Otis moved for
directed verdict on the liability issues, arguing that 

the evidence is quite clear there was no evidence that the elevator was
dangerous, no evidence that it deviated--that Otis' maintenance of the
elevator or the elevator itself deviated from the standard of care in the
industry, or that Otis, more importantly and fundamentally, failed to do
that which a reasonably prudent elevator company would not have done
under the same or similar circumstances.


Otis also argued that there was "no evidence of causation." Requena responded,

[There is a fact issue that should go to the jury that there was
complaints. There is evidence that people were being hit by the
elevator. . . . Otis had a duty to warn the premises owner of these
accidents and to make sure that they modified and made it safer. . . .
Additionally, they failed to test the equipment. They failed to inspect it
regularly. . . . And I believe that there is a negligent act on the part of
Otis as well as that there is a fact issue that the jury must decide
whether, in fact, Mr. Requena did not have an opportunity to move out
of the way.


 The trial court stated that Otis was entitled to a directed verdict because
Requena had not "made your case." However, the trial court stated that it was
sending the case to the jury because if the trial court granted the motion for directed
verdict Requena "would likely have no choice but to cause your client to defend an
appeal. Whereas if the jury returns a defense verdict, what is there to appeal?" The
trial court denied Otis's motion and, after Otis rested without presenting any
witnesses, charged the jury.

 In question number one, the jury was asked, "Did the negligence, if any, of
those named below proximately cause the occurrence in question?" The jury
answered "yes" as to Requena, Fisk, and Otis. In question number two, the jury was
asked, "What percentage of the negligence that caused the injury do you find to be
attributable to each of those found by you, in your answer to Question No. 1, to have
been negligent?" The jury found Requena's negligence to be 35% responsible, Fisk's
negligence to be 15% responsible, and Otis's negligence to be 50% responsible. In
response to question number three, the jury found that Requena was entitled to
$50,000 in damages for past damages and $150,000 for damages that "in reasonable
probability will be sustained in the future." In response to question number four, the
jury found that Requena's wife was not entitled to any damages for loss of household
services or loss of consortium.

 Otis filed a motion for a judgment not withstanding the verdict. The trial court
granted the motion, and, on April 8, 2008, the trial court signed its judgment granting
Otis's motion for judgment notwithstanding the verdict and motion to disregard the
jury's answers finding Otis's negligence 50% responsible for Requena's injuries and
awarding Requena damages. Requena appealed the trial court's grant of judgment
notwithstanding the verdict.

Judgment Notwithstanding the Verdict

 Requena argues in his sole issue that the trial court erred in granting Otis's
motion for judgment notwithstanding the verdict.

A. Standard of Review

 We review a judgment notwithstanding the verdict under a legal-sufficiency
standard, viewing the evidence and inferences in the light most favorable to the jury's
finding. City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005). We sustain the
granting of a judgment notwithstanding the verdict based on "no evidence" when the
record shows: (1) a complete lack of evidence of a vital fact; (2) the trial court is
barred by the rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more
than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact. Id. at 810; see also Tiller v. McLure, 121 S.W.3d 709, 713 (Tex. 2003) (holding
trial court may grant judgment notwithstanding verdict if there is no evidence to
support jury's finding on issue necessary to liability).

 If more than a scintilla of evidence supports the jury's finding, "the jury's
verdict, and not the trial court's judgment must be upheld." Wal-Mart Stores, Inc. v.
Miller, 102 S.W.3d 706, 709 (Tex. 2003). More than a scintilla of evidence exists
when the evidence "rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions." Ford Motor Co. v. Ridgway, 135 S.W.3d 598,
601 (Tex. 2004) (quoting Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711
(Tex. 1997)). Evidence that is "so weak as to do no more than create a mere
surmise," however, is no more than a scintilla and, thus, no evidence. Id. (quoting
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). 

 If the trial court does not state its grounds for granting a motion for judgment
notwithstanding the verdict , as is the case here, the ruling will be upheld if any of the
stated grounds in the motion will uphold the judgment. Fort Bend County Drainage
Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991). It is the appellant's burden to
discredit each ground in the appellee's motion. Kenneco Energy, 921 S.W.2d at 259;
Friedman v. Houston Sports Ass'n, 731 S.W.2d 572, 573 (Tex. App.--Houston [1st
Dist.] 1987, writ ref'd n.r.e.).

B. Negligence

 To establish negligence, a party must establish a duty, a breach of that duty,
and damages proximately caused by the breach. Kroger Co. v. Elwood, 197 S.W.3d
793, 794 (Tex. 2006); see also Greater Houston Transp. Co. v. Phillips, 801 S.W.2d
523, 525 (Tex. 1990).

 1. Duty

 Whether a duty exists is a threshold inquiry and a question of law; liability
cannot be imposed if no duty exists. Kroger, 197 S.W.3d at 794; Van Horn v.
Chambers, 970 S.W.2d 542, 544 (Tex. 1998). "In determining whether the defendant
was under a duty, the court will consider several interrelated factors, including the
risk, foreseeability, and likelihood of injury weighed against the social utility of the
actor's conduct, the magnitude of the burden of guarding against the injury, and the
consequences of placing the burden on the defendant." Greater Houston Transp. Co.,
801 S.W.2d at 525.

 Otis argued that it did not owe Requena a duty "of the scope urged by
Requena." Requena argues that Otis owed him a duty to perform particular acts of
regular maintenance, such as completing a bi-monthly inspection and conducting
frequent testing of the elevator's doors closing speed and pressure. "[A]n elevator
owner owes a duty of ordinary care to protect invitees from an unreasonable risk of
harm because of the elevator." Dallas Mkt. Ctr. Dev. Co. v. Liedeker, 958 S.W.2d
382, 384 (Tex. 1997) ("In other words, an elevator owner's liability is for a defect in
the premises that presents an unreasonable risk of harm, and his duty is to use
ordinary care to prevent such harm."), overruled on other grounds, Torrington Co.
v. Stutzman, 46 S.W.3d 829 (Tex. 2000); see also Lowe's Home Centers, Inc. v. GSW
Mktg., Inc., No. 14-07-00953-CV, 2009 WL 18755784 (Tex. App.--Houston [14th
Dist.] June 30, 2009, no pet.) ("[S]ection 324A [of the Restatement (Second) of Torts]
imposes a duty to perform without negligence only the task that the actor has
undertaken to accomplish.") (quoting Fox v. Dallas Hotel Co., 240 S.W. 517, 520-21
(Tex. 1922) ("Upon defendant . . . taking over the control and repair of the
elevators . . . it became charged with the duty . . . to exercise ordinary care to maintain
the elevators in a condition of reasonable safety for use."), overruled on other
grounds, Burk Royalty Co. v. Walls, 616 S.W.2d 911 (Tex. 1981)). We conclude that
Otis, to the extent that it acted as the agent of the elevator's owner in charge of
maintenance and repairs, owed Requena only a duty to exercise ordinary care to
maintain the elevator in a condition of reasonable safety for use.

 2. Breach

 Otis argues that Requena failed to establish that it breached any duty of care
that it owed to Requena because there was no evidence that the elevator
malfunctioned or that it was unreasonably dangerous. See Elwood, 197 S.W.3d at
794 (holding that breach of duty must be established to recover for negligence).

 Here, Requena provided no more than a scintilla of evidence to prove that the
elevator malfunctioned. He provided no evidence as to the reasonable speed of a
closing elevator door or gate. He provided no evidence as to the actual speed of the
closing elevator door and gate that struck him. Hebert testified that the speed of the
elevator door and gate was checked annually by a City of Houston inspector. 
Requena did not provide any testimony from other users that the speed of the closing
door or gate was unreasonable or unsafe. Requena's expert, Baxter, testified that
there was no indication that any inspecting authority had found any violations
regarding the elevator's operation. Although Requena argues that people were struck
by the elevator and that complaints had been made about the elevator, he fails to point
to any record references of specific incidents.

 All of the evidence establishes that the elevator functioned properly. Requena
heard the buzzer sound for one to two minutes prior to the closing of the gate, but
remained standing in the threshold of the elevator door despite his knowledge that the
buzzer signaled that the door and gate would soon close. Requena's own expert,
Baxter, testified that the elevator was both code-compliant and safe. He also testified
that on the day of Requena's incident, "the elevator probably behaved the way it was
designed."

 Requena failed to prove that Otis breached its duty to maintain the elevator in
a condition of reasonable safety for use.

 3. Causation

 Otis also argues that Requena failed to show that failure to properly maintain
the elevator caused Requena's injury. Because we have already determined that Otis
did not breach its duty to maintain the elevator in a condition of reasonable safety for
use and that Requena presented no evidence that the elevator actually malfunctioned,
we determine that Requena also failed to establish that Otis's maintenance, or, as
Requena argues, its lack of maintenance, caused Requena's injury.

 We overrule Requena's sole issue.Conclusion

 We affirm the judgment of the trial court.




 Evelyn V. Keyes

 Justice


Panel consists of Justices Keyes, Alcala, and Hanks

1. Mary Sue Requena, wife of appellant Jose Requena, is also named as an appellant;
however, Requena stated in his brief that he was not appealing the trial court's
judgment notwithstanding the verdict as it related to Mary Sue. 
2. Requena also sued Fisk, alleging it was negligent because the Fisk employee pressed
the button calling the elevator to the basement, which caused the elevator gate to close
and strike Requena. The trial court subsequently granted Requena's motion to
dismiss Fisk from the suit with prejudice.
3. The record does not clearly identify the person to whom Requena made these
comments--whether it was Vincent Garza, someone else from Otis, or someone who
worked permanently for St. Luke's. Later, Requena's counsel asked, "[D]id you ever
speak to an Otis guy prior to the accident?" However, the trial court sustained Otis's
objection and that question was never answered. There is no other evidence regarding
any complaints made about the elevators in general or about the particular elevator
that struck Requena.
4. The record does not contain any evidence regarding Otis's knowledge of previous
instances of people being struck by the elevator doors or of any reports made to Otis. 
The portions of Hebert's and Garza's depositions discussed by Baxter were not
admitted into evidence during trial or presented to the jury except through Baxter's
testimony.