Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio




# MEMORANDUM OPINION

No. 04-10-00802-CV

**CALLAGHAN RANCH, LTD**.,
Appellant

v.

David **KILLAM**, et al.,
Appellees/Cross-Appellants

From the 341st Judicial District Court, Webb County, Texas
Trial Court No. 92-CVQ-000009-D3
Honorable Ron Carr, Judge Presiding

Opinion by:  Phylis J. Speedlin, Justice

Sitting:  Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice
Marialyn Barnard, Justice

Delivered and Filed:  February 8, 2012

AFFIRMED

Callaghan Ranch, Ltd. filed a suit for declaratory judgment seeking a determination that a certain portion of the San Ygnacio Road ("the Road") was impliedly dedicated to the public before 1992.  The jury failed to find the portion of the Road in question was impliedly dedicated. Callaghan Ranch filed a motion for judgment notwithstanding the verdict (JNOV), arguing that it had conclusively established the implied dedication.  The trial court denied the motion for JNOV, and Callaghan Ranch now appeals on that basis.  On cross-appeal, Sue Spivey Killam,

Individually and as Acting Executor of the Will and Estate of Radcliffe Killam, Deceased and David W. Killam, Individually and as Executor of the Estate of Susan Terry Killam-Wilbur all d/b/a Killam Ranch (collectively, "the Killams," unless stated otherwise) complain of the award of attorney's fees. We affirm the judgment of the trial court.

## BACKGROUND

The Callaghan Ranch was originally formed in 1865. It is presently owned by Callaghan Ranch, Ltd. The partners in the Ranch are members of the Finley family. The Ranch now consists of approximately 84,000 acres and is located entirely in Webb County.

The Killams acquired their ranch, which neighbors the Callaghan Ranch, in 1947 from the Ortiz family. In 1982, the Ranch was partitioned among Killam and Hurd family members. The Hurds received about 35,000 acres and the Killams received approximately 50,000 acres. The Road at issue runs through four ranches (the Killam Ranch, the Hurd Ranch, the Benavides Ranch, and the Callaghan Ranch) and ends 4.2 miles into the Callaghan Ranch. The portion located on the Killam Ranch is approximately 3.2 miles. The Road was defined in the jury charge as a 16.2 mile-long roadway "beginning at the convergence of Del Mar Boulevard, Casa Verde Road and San Ygnacio Road and continuing in a northeasterly direction to the southern entrance of the Callaghan Ranch."

In 1992, World Energy Corporation (WEC), an assignee of a mineral lease located on a ranch neighboring the Killam Ranch, filed a declaratory judgment action against the Killams, alleging that a gate they erected across the Road was impeding a public roadway. Callaghan Ranch intervened, and later became the lead plaintiff. Callaghan Ranch sought a declaration that the Road is a public road by virtue of the doctrine of implied dedication. The Killams answered

the suit, contending that the Road is and has always been a private ranch road. The Killams joined Webb County as a third-party defendant.

In 2000, this court reversed a summary judgment granted in favor of the Killams and remanded the case for trial. *See Callaghan Ranch, Ltd. v. Killam*, 53 S.W.3d 1, 5 (Tex. App.—San Antonio 2000, pet. denied).

The case proceeded to trial in May 2010. A single question was submitted to the jury:

> Do you find that the portion of the San Ygnacio Road that presently passes through the Killam Ranch ("San Ygnacio Road") was impliedly dedicated to the public before 1992?
>
> You are instructed that the elements of implied dedication are:

1. That the acts or inaction of the landowner or landowners over which the road traveled, at the time of the origin of public use of the road, induced the belief that such landowner(s) intended to dedicate the subject road for public use;
2. That the landowner or landowners were competent to do so;
3. That the public relied on such acts and was served by the dedication at that time;
4. That there was an offer and acceptance of the dedication by the public.

The jury answered, "No." Callaghan Ranch then filed a motion for JNOV asserting that it conclusively established the implied dedication by presenting direct evidence that the origin of public use of the Road was shrouded in obscurity as well as evidence of unhindered continuous general public use for a period of more than 100 years. The trial court entered a judgment incorporating the jury's negative finding on implied dedication. The Killams subsequently moved for attorney's fees. The trial court denied the motion, stating that all parties had legitimate rights and/or interests to pursue and, therefore, each party should bear its own attorney's fees. Callaghan Ranch now appeals, complaining of the denial of its motion for JNOV. The Killams present a single issue on cross-appeal relative to attorney's fees.

## STANDARD OF REVIEW

Judgment notwithstanding the verdict is proper where no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper. *See* TEX. R. CIV. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003). The denial of a motion for judgment notwithstanding the verdict is reviewed under a no-evidence standard. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Manley v. Wachovia Small Bus. Capital*, 349 S.W.3d 233, 236 (Tex. App.—Dallas 2011, pet. filed). We "credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). We must uphold the jury's finding if more than a scintilla of competent evidence supports it. *Tanner*, 289 S.W.3d at 830. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Thus, in order to establish that it was entitled to JNOV, Callaghan Ranch must show that the evidence conclusively proved that the Road was public, and that no reasonable jury was free to think otherwise. *Tanner*, 289 S.W.3d at 830. "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller*, 168 S.W.3d at 816.

## DISCUSSION

*Applicable Law*

At trial and on appeal, Callaghan Ranch argued that the Killams' predecessors in title impliedly dedicated the Road to the public. Dedication is the act of appropriating private land to the public for any general or public use. *Baker v. Peace*, 172 S.W.3d 82, 87 (Tex. App.—El

Paso 2005, pet. denied). Whether a road has been dedicated for public use is a question of fact. *Steel v. Wheeler*, 993 S.W.2d 376, 378 (Tex. App.—Tyler 1999, pet. denied); *Broussard v. Jablecki*, 792 S.W.2d 535, 537 (Tex. App.—Houston [1st Dist.] 1990, no writ). The elements of an implied dedication are: (1) the acts of the landowner induced the belief that the landowner intended to dedicate the road to public use;[1] (2) the landowner was competent to do so;[2] (3) the public relied on these acts and will be served by the dedication;[3] and (4) there was an offer and acceptance of the dedication.[4] *Lindner v. Hill*, 691 S.W.2d 590, 592 (Tex. 1985) (citing *Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W.2d 254, 256 (Tex. 1984)); *see also Stein v. Killough*, 53 S.W.3d 36, 42 (Tex. App.—San Antonio 2001, no pet.); *Gutierrez v. County of Zapata*, 951 S.W.2d 831, 839 (Tex. App.—San Antonio 1997, no writ).

Evidence of long and continuous use of the disputed road by the public raises a presumption of dedication by the owner. *Reed v. Wright*, 155 S.W.3d 666, 671-72 (Tex. App.—Texarkana 2005, pet. denied); *see also O'Connor v. Gragg*, 161 Tex. 273, 339 S.W.2d 878, 882 (1960). For the presumption to apply, the origin of the road must be "shrouded in obscurity" so that no evidence of the intent of the owner is available. *O'Connor*, 339 S.W.2d at 883 ("where ownership of the land at the time of such origin is shrouded in obscurity, and no proof can be adduced to show the intention of the owner allowing the use, the law raises a presumption that the requisite intention and acts disclosing it were present"); *Reed*, 155 S.W.3d at 672; *Supak v.*

---

[1] What the landowner actually intended is not an element of implied dedication; rather, the acts of the landowner are examined to determine whether he induced the belief that he intended to dedicate the road. *Gutierrez v. County of Zapata*, 951 S.W.2d 831, 839 n.9 (Tex. App.—San Antonio 1997, no writ) (citing *Las Vegas Pecan & Cattle Co.*, 682 S.W.2d at 256).

[2] The dedicator must have fee simple title. *Gutierrez*, 951 S.W.2d at 839 n.10 (citing *Broussard*, 792 S.W.2d at, 537).

[3] *See Gutierrez*, 951 S.W.2d at 839 n.11 (citing *Malone v. Whitfield*, 621 S.W.2d 192, 195 (Tex. Civ. App.—Waco 1981, writ ref'd n.r.e.)) (longtime uninterrupted use by the public).

[4] *See Gutierrez*, 951 S.W.2d at 839 n.12 (no formalities are required for dedication and acceptance) (citations omitted).

*Zboril*, 56 S.W.3d 785, 790 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Graff v. Whittle*, 947 S.W.2d 629, 637 (Tex. App.—Texarkana 1997, writ denied); *Fazzino v. Guido*, 836 S.W.2d 271, 274 (Tex. App.—Houston [1st Dist.] 1992, writ denied). Thus, we must determine whether Callaghan Ranch conclusively proved that the origin of the Road was "shrouded in obscurity" and that, from that time forward it was subject to long and continuous use by the public.

Because an implied dedication results in the appropriation of private property for public use without any compensation to the landowner, Callaghan Ranch bore a heavy burden to establish an implied dedication. *Van Dam v. Lewis*, 307 S.W.3d 336, 340 (Tex. App.—San Antonio 2009, no pet.) (citing *County of Real v. Hafley*, 873 S.W.2d 725, 728 (Tex. App.—San Antonio 1994, writ denied)); *see also* TEX. CONST. art. I, § 17.

### The Evidence at Trial

Several witnesses testified on behalf of Callaghan Ranch. Joe Finley, Jr. is the present owner of the Callaghan Ranch. Except for time he spent at school and serving in World War II, Finley has always lived on the Callaghan Ranch. Finley recounted using the Road to herd cattle as early as 1936. He stated that other ranchers used the Road too, although he "can't tell you that I saw them doing it, but I'm sure they did." A pamphlet entitled "Callaghan Ranch: Yesterday and Today, published by Callaghan Land and Pastoral Company, was admitted into evidence. The pamphlet recounts the existence of a road between Laredo and San Antonio.

Finley stated that between 1942 and 1946 the Army Air Force built a gunnery range along the Road. The Road was also paved during that time. Finley recalled seeing Border Patrol, a school bus, and even an occasional taxicab on the paved road. He also occasionally saw Webb County performing maintenance on the bridges on the Road.

On cross-examination, Finley stated that the Killams had never prevented him from traveling on the Road, and had provided him with a key to access the gate. Finley did not provide keys to his five gates to the Killams or to any other neighboring ranchers. He admitted that the Road abruptly becomes private once you reach the Callaghan Ranch.

James Kelly, Jr. is a certified professional landman. His research revealed that the Killam Ranch was originally part of a Spanish land grant dating back to 1767. The next recorded public document referencing the land is dated 1876. Kelly referenced a map on which he located a road that ran between Laredo and Bexar County, but he could not say that it was the same as the San Ignacio[5] Road is today.

In a periodical dated 1948, Kelly found a report about the location of Fort Ewell written in 1853. The report advises that the location of the fort was to the south of the Nueces River at the point where it is crossed by the road leading from San Antonio to Laredo. Essentially, this report indicated to Kelly that the road coming out of Fort Ewell may well have been the same as the northern portion of the road that currently runs down through Callaghan Ranch. Kelly discovered several other publications mentioning a Road coming out of Laredo and going through the Nueces River and into the Callaghan Ranch area.

Kelly also testified regarding a publication that recounted an expedition from Laredo through Texas in 1828. It references the Chacon Creek, which is presently located near the San Ignacio Road outside of Laredo. The expedition next stopped at El Pato and then at La Parida. The road is described as a leveled road lined with shrubs. Based on these landmarks and other maps, Kelly believed that the road described by the Laredo expedition is the same as the current San Ignacio Road. Kelly continued to testify regarding maps and historical documents/publications he used to research the Road and to form an opinion that the present-day

---

[5] San Ygnacio Road is interchangeably referred to as San Ignacio Road.

Road was used by the public; however, Kelly could not determine the exact beginning time that the public started using the Road because "it goes too far back in history." Kelly also based his opinion of public use on affidavits and depositions of other landowners.

On cross-examination, Kelly acknowledged that he could have been incorrect in stating that a league was equivalent to one and a half or two miles. Kelly also admitted that the city of Laredo was much smaller in ancient times than depicted in the modern-day map he used to pinpoint the Road's location. Kelly conceded that with using a three-mile measurement, his estimate of the 1828 expedition's travel could be wrong, and could be off by as much as four to five miles in terms of the location of El Pato. After stating that the old San Antonio Road and the Ignacio Road were the same, Kelly later agreed that they appeared to be two separate roads on a certain map. Kelly could not identify any public institutions, such as museums, cemeteries, or police stations on the Road that would benefit the public.

Rhonda Tiffin was called as an adverse witness. Tiffin was employed by Webb County for over 25 years, and originally worked in the Road and Bridge Department. Tiffin testified that, according to County records, San Ignacio Road was a paved road 16.2 miles in length being maintained by the County Road Department in November of 1974. Work orders for maintenance on the Road during the 1970s were also introduced, but Tiffin could not say when and if the work was performed, let alone where on the Road it was performed.

Tiffin also testified as to memorandums she prepared regarding periodic maintenance performed by the County on the unpaved portion of the Road three to five miles beyond the Detention Center on the Killam property. In one memo she states "it has been brought to my attention that there are property owners beyond the Killam property who are presently utilizing this road."

On cross-examination, evidence was introduced to suggest that the County maintenance may have been done in exchange for caliche. Tiffin also testified regarding a letter she wrote to David Killam in 1988, in which she states that the County based its responsibility for maintenance on the dedication of land by the U.S. government to the County for the detention center. In essence, the County had an easement right to use the Killams' private roadway to access the detention center. The letter was written in response to David Killam's request to cease County maintenance of the Road.

James Fulgham is a retired Border Patrol agent who occasionally traveled the Road between the detention center and the Callaghan gate while working between 1977 and 1996. He did not encounter a locked gate near the detention center until the mid to late 1980s. Fulgham is now employed by Mr. Finley.

The following witnesses testified via video deposition:

Gene Walker

Walker has lived in Webb County all his life. His family owns several ranches to the east of the Callaghan gate. Walker used the Road to drive cattle as early as 1935. He stated that his father was given permission to rest the cattle overnight at the San Ignacio headquarters. He also used the Road to travel to a friend's at the Ferro Ranch in the early 1950s. The Ferro Ranch was landlocked and the owners were granted permission to use the Road to get to their property. Walker saw other people traveling on the Road, but he had no way of knowing whether they lived or worked on the ranches surrounding San Ignacio Road.

Frank Leyendecker

Leyendecker has lived in and around Laredo his entire life. He remembered traveling on the Road to the Callaghan Ranch in the 1930s as a guest of the ranch. He also traveled on the

Road in the 1970s for the same purpose. He later acquired a hunting lease on Callaghan Ranch. He observed trucks on the Road, presumably related to the oil field, and also County maintenance crews working on the Road. After the gate was installed near the detention center he was given a key by the Callaghan Ranch.

Manuel Raymond

Raymond testified that his father acquired a hunting lease on the south part of the Callaghan Ranch in about 1940. They used the Road to access the lease from that time until about 1954. There were no gates on the Road at that time. The only other traffic he noticed was military vehicles accessing the gunnery range.

Manuel Benavides

Benavides owns ranches that abut the San Ignacio Road. He used the Road to access his ranch until Highway 59 was completed in the mid-1950s. He saw others using the Road as well. A gate was located just past the detention center and it was occasionally latched. He also noticed County maintenance personnel doing work on the Road.

Benavides, who was a friend of David Killam's, recalled Killam telling him in the early 1990s that he was going to lock a gate on the Road due to recent incidents; Benavides was given a key to the gate. He had not noticed any County upkeep of the Road since the 1970s and was concerned about the condition of the Road.

At the close of the plaintiff's case, the Killams moved for a directed verdict. The motion was denied by the trial court.

Four witnesses testified for the defense. John Hurd is David Killam's cousin. Hurd used the Road to hunt when he was a teenager, and remembered a gate at the western end of the Road

as far back as when he was 14 years old—in the late 1950s. His ranch manager is presently able to traverse the Road by way of a key which opens the gate that was provided by the Killams.

David Killam is the Ranch's current manager and has been since 1975. Killam's family purchased the Killam Ranch from the Ortiz family in 1947. Prior to that, in 1929, L.R. Ortiz filed a trespass to try title suit, thus clearing his title to 83,000 acres of ranchland. An affidavit by L.R. Ortiz dated 1930 states that the 83,000 acres have been fenced in for more than 25 years.

From 1942 to 1945, the federal government was given an easement to use 36,000 acres of land on the Killam Ranch (previously Ortiz Ranch) and partially on the Callaghan Ranch to operate a gunnery range. Killam stated that at that time the federal government put in the Road to access the gunnery range. In 1956 or 1957, the government leased a 294-acre tract from the Killams for a radar test site. At the same time, the government leased a 60-foot right of way in order to access the radar site. There was also a second 10-foot easement granted into the radar center. In 1958, the federal government purchased the property. In 1980, the government transferred the 294-acre tract to Webb County for use as the detention center.

Killam stated the Road is rough, not presently maintained, and that cattle roam the road. He never had any intention to donate the Road to the public. The Killams did, however, allow neighboring ranches to access private ranch roadways, stating that, "with neighbors, so long as there's good relationships and everybody does their part, you know it's fine to allow other people to use your gate, and by permission it's acceptable." The Killams gave keys to those needing access, such as to the school bus driver and other cattle ranchers, oil field workers, and law enforcement officers.

Oscar Sepulveda is a civil engineer and land surveyor. He was hired by the Killams to determine whether the Road was public or private. Using prior deeds and instruments and

conducting his own survey, he concluded that the Road was private. Sepulveda stated the Road was built to provide access to and from the government gunnery range while it was operated during World War II. After the Killams acquired their interest in 1947, the U.S. government sought use of the Road and the Killams granted them permission through an easement recorded in leases and deeds. To make his determination that the Road was private, Sepulveda specifically referenced the 1957 lease from the Killams to the U.S. government, the 1958 deed from the Killams to the U.S. government, and the 1980 deed from the U.S. government to Webb County. Each of these documents call out a point at which the county roadway ends and the private roadway begins.

When asked why a 1942 metes and bounds description (identifying the property being used for the gunnery range) prepared by the federal government references "a public road," Sepulveda answered that the federal government must have disputed the description at a later time, because had the Road actually been public, the federal government would not have subsequently entered into an easement agreement with the Killams in the 1950s. Sepulveda did not research public use of the Road.

Thomas Rodriguez, Jr. testified on behalf of Webb County. Rodriguez is a former Webb County Engineer and researched the 1980 deed from the U.S. government to the County. He stated the County owned "Casa Verde Road from the rivers." (The Road has also been referred to as Casa Verde Road or Rancho Verde Road). He stated that once inside the Callaghan Ranch, the Road today does not continue on to San Antonio. Rodriguez concluded that although a perpetual easement to Webb County allows access to the property formerly used as the Webb County Detention Center, the continuation of Case Verde Road past the Killam gate is a private road.

From reviewing County maintenance records, it was unclear to Rodriguez whether maintenance was performed on the Killam property (i.e., on the non-County easement portion). In fact, Rodriguez disagreed with Tiffin's statement that County maintenance was performed on the unpaved portion of the Road beyond the detention center based on inaccuracies in County records. He specified that the 1974 County road log incorrectly reflected that the Road consisted of 16.2 paved miles.

*Analysis*

Here, the jury found from the disputed evidence that the Road was private. Thus, in order for us to reverse the jury's finding, Callaghan Ranch must demonstrate that the evidence conclusively establishes that the Road was impliedly dedicated as a matter of law. *See Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982); *Scott v. Cannon*, 959 S.W.2d 712, 719 (Tex. App.—Austin 1998, pet denied).

Callaghan Ranch contends that the origin of the Road is shrouded in obscurity because title documents are lacking between 1767 and 1876 and there was evidence of public use in 1828. The Ranch also argues that the public continually used the Road beginning in the 1800s and continuing through the 1990s. The Ranch cites to witness testimony regarding personal travel on the Road, as well as witness observation of law enforcement personnel and Border Patrol on the Road. Witnesses also observed County maintenance crews on the Road prior to 1992.

In response, the Killams contend that Callaghan Ranch has not conclusively proved long and continuous public use of the Road or that the Road was shrouded in obscurity. Further, even if Callaghan Ranch did prove its entitlement to a presumption of dedication, the Killams maintain they provided evidence refuting the presumption of donative intent. We agree that, on

this record, Callaghan Ranch has not proved its entitlement to a presumption of dedication as a matter of law. A presumption of dedication is warranted when there exists long and continuous public use of a road whose origin is shrouded in obscurity. *See Graff*, 947 S.W.2d at 637. For the presumption to apply, the proof of long and continuous use by the public must be uncontested. *See Rogers v. Stover*, No. 06-07-00053-CV, 2008 WL 191164, at *3 (Tex. App.—Texarkana Jan. 18, 2008, no pet.) (mem. op.). Even assuming that the Road was shrouded in obscurity, Callaghan Ranch failed to conclusively establish long and continuous public use.

The jury was not required to accept evidence that public use dated back to the 1828 expedition, given that none of the publications testified to by James Kelly, Callaghan Ranch's expert, mention the San Ygnacio Road. The jury was free to disbelieve Callaghan Ranch's conclusion that the pathway described is the same as the present-day Road. Although Kelly testified that he believed the ancient roadway described in texts is the same as the San Ygnacio Road, he did not prepare a metes and bounds description of the expedition pathway. Other errors in Kelly's testimony could have left the jury doubting his credibility, such as his mistaken definition of a league and resulting erroneous calculation of the 1828 expedition travel route. Kelly also failed to account for the difference in size between the modern-day city of Laredo and Laredo as it would have appeared in ancient times. Further, Kelly mistakenly assumed that San Ygnacio was the same as Old San Antonio Road and admitted that he could not tell whether the path traveled by the 1828 expedition later became the San Ygnacio Road or Old San Antonio Road. In sum, the evidence presented by Callaghan Ranch did not conclusively prove that the Road was impliedly dedicated to the public.

Additionally, the Killams presented evidence rebutting the alleged presumption of implied dedication. Killam testified that the Road was created during World War II to give the

government access to its gunnery range. Any travelers seen on the road after that time would have been there either pursuant to an easement, or by permission from the Killams to access neighboring ranches or leases. Given this controverting evidence, Callaghan Ranch cannot conclusively prove public use. *See Rogers*, 2008 WL 191164, at *6 (sporadic instances of public use over a lengthy period of time do not constitute continuous use).

Moreover, the vast amount of testimony regarding County maintenance of the Road was contradicted by Rodriguez, who stated that he could not confirm what portion of the 16.2 mile-long Road was actually worked on. Because the work could have been performed only on the County's easement, the jury was free to disregard the evidence related to County maintenance on the Road.

Because Callaghan Ranch has not conclusively proved that the Road was impliedly dedicated to the public, it has not established that the trial court erred in refusing to enter a JNOV. *See Tanner*, 289 S.W.3d at 830; *City of Keller*, 168 S.W.3d at 802, 823. Accordingly, we overrule Callaghan Ranch's issue on appeal.

*Cross-Appeal Attorney's Fees*

By way of cross-appeal, the Killams argue that the trial court erred in denying its motion for attorney's fees. In a declaratory judgment action, the trial court may award reasonable attorney's fees and costs "as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008). The trial court's decision is discretionary, and will not be reversed absent a clear abuse of that discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985).

The Killams moved for attorney's fees after the jury returned a verdict in their favor. At a hearing on the motion, the Killams presented evidence of attorney's fees via documentary proof and through the testimony of their attorney, Edward D. Vassallo. Vassallo stated that the

Killams incurred $481,430 to defend themselves in the declaratory judgment action pursued by Callaghan Ranch. In denying the request for attorney's fees, the trial court explained: "The Court finds that all parties had legitimate rights and/or interests to pursue and therefore, each party should bear its own attorney's fees." From this statement, the Killams infer that the trial court abused its discretion by finding the attorney's fees sought were not "equitable and just" because it based its ruling on the mistaken belief that all parties pursued legitimate "rights and/or interests." The Killams contend that this was not a case where the "prevailing party" initiated the lawsuit or where both parties filed competing claims. Instead, they argue the trial court ignored the fact that its attorney's fees were reasonable and necessary.

The Uniform Declaratory Judgments Act "does not require an award of attorney fees to the prevailing party." *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). Rather, "the Declaratory Judgments Act entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Id.* at 21. The determination of whether attorney's fees are equitable and just, though questions of law, remain within the trial court's discretion. *Id.* Thus, a trial court "may conclude that it is not equitable or just to award even reasonable and necessary fees." *Id.*; *Bauer v. Williams*, No. 03-07-00494-CV, 2008 WL 3166311, at *2 (Tex. App.—Austin Aug. 8, 2008, no pet.) (mem. op.).

On this record, we cannot conclude that the trial court abused its discretion in determining that both parties pursued legitimate rights. "It is not an abuse of discretion to deny attorney's fees under the UDJA on the basis that both parties had legitimate rights to pursue such that it would not be equitable or just to award either attorney's fees." *RDG P'ship v. Long*, 350

S.W.3d 262, 278 (Tex. App.—San Antonio 2011, no pet.); *Sunday Canyon Prop. Owners Ass'n v. Annett*, 978 S.W.2d 654, 659 (Tex. App.—Amarillo 1998, no pet.); *see also Knighton v. Int'l Bus. Machs. Corp.*, 856 S.W.2d 206, 210-11 (Tex. App.—Houston [1st Dist.] 1993, writ denied). Accordingly, we overrule the Killams' issue on cross-appeal.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed in all respects.


Phylis J. Speedlin, Justice